# Illinois Official Reports

## Appellate Court

---

### *Drury v. Village of Barrington Hills*, 2018 IL App (1st) 173042

---

| | |
|---|---|
| Appellate Court Caption | JAMES J. DRURY III, as Agent of the Peggy D. Drury Declaration of Trust Under Agreement Dated February 4, 2000; JACK E. REICH; and JAMES T. O'DONNELL, Plaintiffs-Appellants, v. THE VILLAGE OF BARRINGTON HILLS, an Illinois Municipal Corporation, Defendant-Appellee (Benjamin B. LeCompte III; Cathleen B. LeCompte; John J. Pappas Sr.; Barrington Hills Polo Club, Inc.; Barbara McMorris; Victoria Kelly; Marianna Bernardi; Pasquale Bernardi; Judith K. Freeman; BHFW, LLC, d/b/a Barrington Hills Farms, Intervenors-Appellees). |
| District & No. | First District, Third Division<br>Docket No. 1-17-3042 |
| Filed | December 12, 2018 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 15-CH-3461; the Hon. David B. Atkins, Judge, presiding. |
| Judgment | Affirmed in part, reversed in part, and remanded. |
| Counsel on Appeal | Thomas R. Burney, of Law Office of Thomas R. Burney, LLC, of Crystal Lake, for appellants.<br><br>Bond, Dickson & Conway, of Wheaton (Patrick K. Bond, of counsel), for appellee Village of Barrington Hills. |

Patrick Fitzgerald, Mark E. Rakoczy, Jennifer Berman, and Brooke A. Winterhalter, of Skadden, Arps, Slate, Meagher & Flom, LLP, of Chicago, for appellee Barrington Hills Farm.

James P. Kelly, of Matuszewich & Kelly, LLP, of Crystal Lake, for other appellees.

Panel           JUSTICE ELLIS delivered the judgment of the court, with opinion. Presiding Justice Fitzgerald Smith and Justice Cobbs concurred in the judgment and opinion.

**OPINION**

¶ 1      Forty miles northwest of Chicago sits the Village of Barrington Hills, which prides itself on its "equestrian heritage," consisting in large part of sizeable lots amenable to the breeding, training, and raising of horses, and with miles of interwoven trails suitable for horseback riding. To that end, by ordinance, the Village permits its residents to engage in horse-boarding activities on their residential property.

¶ 2      In 2006, the Village amended its zoning code to permit residential horse boarding as a "home occupation," which essentially meant residents could board horses but subject to strict limitations and only during specified hours. Two years later, the Village cited intervenor-defendant Benjamin LeCompte III for violating the ordinance, claiming that he was conducting a large-scale commercial horse boarding operation that exceeded any "home occupation" as defined by ordinance. LeCompte fought the citation administratively and in court. While he held off the Village, other Village residents filed a lawsuit of their own, attempting to restrain his operation.

¶ 3      After he lost his appeal in this court against the Village and while he fended off a legal challenge from his neighbors, LeCompte turned to the Village's board of trustees (Board) for a legislative remedy.

¶ 4      His effort succeeded. In February 2015, the Board adopted an ordinance (Ordinance 14-19) over the president's veto that permitted large-scale horse boarding operations on residential property throughout the Village as a matter of right. It also made this rezoning retroactive to 2006, thus effectively validating LeCompte's operations from their inception and thereby eliminating the fines LeCompte had accumulated from the Village. The ordinance, in essence, gave LeCompte a legislative pardon.

¶ 5      Not everyone was pleased. Days after Ordinance 14-19's adoption, plaintiffs, residents of the Village who fear that large-scale horse boarding will destroy the residential character of the neighborhoods and lower their property values, filed suit in this case—lawsuit number three in this saga, the one before us now—alleging, among other things, that Ordinance 14-19 violated substantive due process because it was passed for the benefit of LeCompte only and was wholly unrelated to the public health, safety, and welfare.

¶ 6        Two months later, in April 2015, the composition of the Board changed following the consolidated election. The newly constituted Board now agrees with plaintiffs here that Ordinance 14-19 was unconstitutional. It also repealed Ordinance 14-19 in 2016, less than a year after it took effect.

¶ 7        What is more, the Village entered into an agreed settlement order with plaintiffs, agreeing that Ordinance 14-19 was void *ab initio*, and asked the trial court to enter judgment on that agreed order.

¶ 8        LeCompte and others intervened in this lawsuit below, moving to dismiss the constitutional challenge and objecting to the Village's and plaintiffs' attempt to "agree" that Ordinance 14-19 was void *ab initio*.

¶ 9        The circuit court refused to enter the agreed settlement order and then granted the intervenors' motion to dismiss the complaint, reasoning that this lawsuit was simply asking it to take sides in a policy debate, which it declined to do. Both of those rulings are challenged on appeal.

¶ 10       We affirm the trial court's rejection of the Village's and plaintiffs' agreed settlement order. But we cannot agree with the circuit court's assessment of Drury's due-process claim. Drury's complaint does not allege that the 2015 amendment was unconstitutional because the Board chose the wrong policy. Rather, he claims that Ordinance 14-19 violated substantive due process because it was not rationally related to the public health, safety, or welfare of the Village—that instead, it was passed solely for the benefit of one person, LeCompte. He has pleaded sufficient facts to state that claim. We reverse the dismissal of that challenge only and remand for further proceedings.

¶ 11                                                    BACKGROUND

¶ 12       The following facts are taken from Drury's first amended verified complaint (the complaint), as well as two related cases decided by this court to which Drury's complaint repeatedly refers. See *LeCompte v. Zoning Board of Appeals*, 2011 IL App (1st) 100423 (*LeCompte I*); *Drury v. LeCompte*, 2014 IL App (1st) 121894-U (*LeCompte II*). Additional background regarding the intervenors has been taken from their complaints in intervention.

¶ 13       Plaintiff James Drury III is a resident of Barrington Hills whose property sits adjacent to LeCompte's property, upon which LeCompte is operating an "unlawful large scale commercial horse boarding operation." Plaintiffs Jack Reich and James T. O'Donnell are both residents of Barrington Hills. Defendant Village of Barrington Hills is an Illinois municipal corporation with home rule authority. (For ease, we refer to plaintiffs in the singular as "Drury.")

¶ 14       The intervenors are all residents of Barrington Hills. John J. Pappas Sr. resides on a 14-acre tract of land known as "Shamrock Farms" that has 2 barns with 18 horse stalls, an indoor riding arena, 2 outdoor arenas, and 10 fenced paddocks. When Pappas intervened, he had 12 horses stabled on his property, including horses owned by "others." LeCompte and his wife, Cathleen, reside at a property known as "Oakwood Farms," which has a polo field and a "large barn" with 60 horse stalls. Barrington Hills Polo Club, Inc., is an Illinois not-for-profit corporation with 45 members, "many of whom live in the Village of Barrington Hills as well as board and stable their horses in the Village of Barrington Hills." The club's main playing field is located

at Oakwood Farms. Barbara McMorris maintains a barn on her property, which she uses to stable "up to 6 horses."

¶ 15   In June 2006, the Village amended its zoning code to permit residential horse boarding as a home occupation. The regulation was strict: except between 8 a.m. and 8 p.m., only immediate family residing on the premises could participate in boarding activities or bring vehicles or machinery related to horse boarding onto the property. See Barrington Hills Municipal Code § 5-3-4(D)(3)(g) (eff. June 26, 2006) (the 2006 Ordinance).

¶ 16   In January 2008, the Village issued a cease-and-desist letter to LeCompte. The letter stated that LeCompte was running a large-scale commercial horse boarding operation at Oakwood Farms, in violation of the 2006 Ordinance.

¶ 17   LeCompte did not take the citation lying down. Instead, he appealed the citation—first to the Village's zoning board of appeals (ZBA), which upheld the order, and then to the circuit court, which also upheld the citation. LeCompte then appealed the circuit court's order to this court, precipitating our decision in *LeCompte I*.

¶ 18   During these proceedings, the Village did not enforce the citation against LeCompte. In December 2010, Drury sent a letter to the Village asking that it enforce the cease-and-desist order. In January 2011, the Village attorney wrote back and informed Drury that the Village had decided to take no further action against LeCompte.

¶ 19   That prompted Drury to take matters into his own hands. In January 2011, he filed a lawsuit against LeCompte under section 11-13-15 of the Illinois Municipal Code (65 ILCS 5/11-13-15 (West 2010) seeking a court order enjoining LeCompte from violating the 2006 Ordinance. The circuit court dismissed Drury's complaint, and he appealed to this court, precipitating our decision in *LeCompte II*.

¶ 20   After Drury filed his lawsuit, three things of note happened, according to the complaint. First, in February 2011, LeCompte made campaign contributions to the reelection campaigns of village trustees Joe Messer, Patty Meroni, and Karen Selman. The checks were endorsed by each candidate into the bank account for a group called "Save 5 Acres," but they did not indicate that LeCompte was the source of the funds. As a result, a complaint was filed against Messer, Meroni, Selman, and LeCompte with the Illinois State Board of Elections, and in June 2011, the State Board of Elections found each party guilty of violating the Election Code (10 ILCS 5/1-1 *et seq.* (West 2010)). That is noteworthy because, according to the complaint, Messer and Meroni were on the Board when it refused to (1) enforce the 2008 cease-and-desist letter against LeCompte and (2) levy fines against LeCompte to recoup any of the substantial sums of money that the Village spent defending the 2006 ordinance in the proceedings that generated *LeCompte I*.

¶ 21   Second, on March 15, 2011—a mere month after LeCompte made the campaign contributions to Messer, Meroni, and Selman—LeCompte allegedly obtained a letter from Don Schuman, the Village's building and code enforcement officer, stating, in apparent reliance on a change in Oakwood Farms' operating hours, that "it appear[ed] that the use of Oakwood Farms is a Home Occupation." But the Schuman letter was of dubious authenticity. According to Drury, there was "substantial evidence" that the Schuman letter "was not authored by Mr. Schuman but instead by an officer of the Village, the then President of the Village Board, Robert Abboud."

¶ 22    That is a bold claim, but apparently there was some truth to it. When the Village answered Drury's complaint, it expressly "denie[d] that the letter was either authored by or signed by Donald Schuman." But the Schuman letter's dubious quality notwithstanding, Messer, Meroni, and Selman refused to "disown" or "reject" it, even though the Village attorney opined that Abboud was "not authorized under either the Illinois Municipal Code or the Village Ordinance to interpret Village Ordinances."

¶ 23    And third, after Drury filed his lawsuit against LeCompte, the Village began holding meetings to discuss a text amendment to the zoning code that would permit large-scale horse boarding operations on residential property.

¶ 24    In June 2011, we filed our decision in *LeCompte I*. We affirmed the ZBA's decision upholding the cease-and-desist order, which found LeCompte to be in violation of the 2006 Ordinance. We specifically found that (1) LeCompte's commercial horse boarding operation violated the 2006 Ordinance, (2) the use of land for commercial horse boarding operations did not qualify as "agriculture" under section 5-2-1 of the Village code, and (3) because commercial horse boarding did not qualify as agriculture, it was not a permitted use in an R-1 zone. See *LeCompte I*, 2011 IL App (1st) 100423, ¶¶ 39, 53.

¶ 25    In July 2011, Judith Freeman, chairman of the ZBA, sent a letter to the Board. The letter indicated that the ZBA recommended that the Village address problems with the horse boarding provisions of its zoning code by adopting a special-use approach:

> "As you are aware, this issue has been under consideration for several years and numerous meetings and discussions have taken place with regard to it. We have had various 'white papers' submitted to us by the Equestrian Commission and a number of proposals that have been made by the Legal Committee, and Equestrian Commission and others. We are aware of the situation with Oakwood Farms and the recent holding by the Illinois Appellate Court denying the claim by Oakwood Farms that horse boarding is agriculture and therefore a permitted use.

> In 2005, the ZBA recommended and the Board of Trustees approved changes to the Home Occupation Ordinance, which allowed horse boarding as a home occupation. *While we considered simply allowing all boarding operations to operate as home occupations, we felt that was not the best approach*. Larger boarding operations can have negative impacts on the surrounding properties. In these circumstances, we are recommending that larger boarding operations should be required to obtain a Special Use Permit. The special use permit requirement would allow the community to have some involvement in whether such operations are appropriate at that particular location and, if so, under what conditions they should operate." (Emphasis added.)

¶ 26    But then nothing happened. According to Drury's complaint, Freeman's proposal to adopt a special-use approach "languished," and "[n]o further actions or initiative on a text amendment concerning large scale commercial horse boarding operation was undertaken by the Village" for nearly three years—until Drury's lawsuit against LeCompte was reinstated by this court in *LeCompte II*.

¶ 27    In *LeCompte II*, we reversed the circuit court's order dismissing Drury's complaint against LeCompte under section 11-13-15 of the Illinois Municipal Code. As Drury notes in his complaint, in the course of rendering our decision, we emphasized that LeCompte only solicited the Schuman letter after Drury sued LeCompte, and we observed that the clear

purpose of the letter was to "derail" Drury's suit against LeCompte. *LeCompte II*, 2014 IL App (1st) 121894-U, ¶¶ 45, 54.

¶ 28 According to Drury, after our decision in *LeCompte II*, LeCompte began fresh efforts to utilize the text amendment process that mysteriously stalled after Freeman published her July 2011 letter reporting the ZBA's recommendation to pursue a special-use approach. Specifically, on June 17, 2014, LeCompte petitioned the ZBA to adopt a text amendment to the Village's zoning code that would (1) permit large-scale commercial horse boarding operations on residential property *as a matter of right* and (2) apply retroactively. On July 21, 2014, the ZBA held a public hearing on the LeCompte text amendment.

¶ 29 Around the same time, Drury and James Hammon, another resident, filed petitions for text amendments incorporating the special-use approach first devised by Freeman in 2011. The Village Board conducted a public hearing on Drury's and Hammon's text amendments on September 9, 2014.

¶ 30 On September 11, 2014, the ZBA voted 5 to 2 to recommend approving the LeCompte text amendment. On September 22, the Board met to consider the LeCompte text amendment. During the meeting, several objections were made, including (1) the ZBA's recommendation "was not accompanied by any findings of fact or evidence to support its recommendation," (2) the ZBA failed to "gather essential baseline information in order to make a reasoned decision," and (3) on the night the LeCompte text amendment was submitted to the ZBA, ZBA member Kurt Anderson made a "substantial amendment" to the text amendment's language, which "was not subject of preview, review, and public comment."

¶ 31 In response, the Board postponed consideration of the LeCompte text amendment and "directed the Village Administrator and the [ZBA]" to engage in extensive fact-finding "before considering any further amendments" to the horse boarding ordinance. On October 17, the Board requested answers to the following questions within 90 days:

"1. HUSBANDRY: What is the allowed number of horses per area? *Comment*. Information on density of horses has been examined by other jurisdictions but the underlying value has not reference the source [*sic*]. To that end, qualifying academic individuals in the area of equestrian husbandry may be consulted for their opinion on the subject.

2. PROPERTY TAX ASSESSMENT: If horse boarding is an allowed agricultural use, what is the potential property tax impact? *Comment*. The assessment value of property is that which is set by township assessor *** according to adopted guidelines by the Illinois Department of Revenue. A local assessor may be consulted for an opinion.

3. PLANNING:

[3.1] If horse boarding is an allowed commercial activity, does this create the potential for additional commercial activities in the Village?

[3.2] What is the effect of a permitted use of this type versus making it a special use?

*Comment*. Both questions go to the basic elements of planning meaning the identification of the trend of development and techniques of zoning regulations. The land use consultant who assisted the Village in the uses and revision of the Comprehensive Plan may be consulted for an opinion.

4. ENGINEERING: What is the potential cause/effect on the Village roads by allowance of commercial boarding (trailers/disposal/hay)? *Comment*. Traffic loads and volumes are subjects presently address [*sic*] through the duties of the Village Engineer, and may be consulted for an opinion.

5. ENVIRONMENT: What is the effect on the aquifer of large scale commercial boarding? *Comment*. Ground water is a subject reviewed and opined by BACOG including availability of its consultant to specific geographically and land use concerns. An opinion on this subject may be requested.

6. ENFORCEMENT: What would be the role of the building department if the text amendment is adopted? *Comment*. The Building Department is the general enforcement entity of either the Zoning or Building Code.

7. CLARIFICATION: What are the allowed hours of operation? *Comment*. Hours of activity are set by the Village dependent on the use."

¶ 32    Three days later, on October 20, 2014, Kurt Anderson—the same Kurt Anderson who made the last-minute changes to the LeCompte text amendment immediately before the ZBA was to vote on it—initiated his own text amendment. According to Drury's complaint, the Anderson text amendment was "remarkably similar to the LeCompte Text Amendment" and, "[w]hile nominally introduced by Anderson, [was] the rebirth of the LeCompte Text Amendment." Among their similarities, both text amendments (1) permitted large-scale boarding operations in residential property as a matter of right and (2) contained provisions making them retroactive to June 26, 2006.

¶ 33    On December 2, 2014, the ZBA held a public hearing on the Anderson text amendment. At the hearing, none of the witnesses presented by the Village testified that the Anderson text amendment promoted the public welfare. Konstantine Savoy, an "expert land planning witness," testified that (1) he "had no opinion on whether the Anderson Text Amendment satisfied the standards in the Village Code," (2) he was not asked to render such an opinion, and (3) it would take "much further study involving *** an interdisciplinary team to render such an opinion." In addition, Savoy testified that "[i]n his 30+ years as a professional land planner involved in assisting in the drafting of zoning regulations, he could not recall a single instance of an ordinance ever having been adopted that contained a retroactivity provision like the Anderson Text Amendment." Testifying further, Savoy stated that he "could not identify any community that permits large scale commercial horse boarding as a matter of right," and that based on a survey of five communities—Mettawa, Wayne, Bull Valley, Homer Glenn, and Wadsworth—each community that "provided for commercial horse boarding adopted the special use approach."

¶ 34    Schuman testified in support of a permit approach rather than a permitted-as-a-matter-of-right approach, and he stated that "[i]n all of his years with the Village," he had "never seen the Village adopt an ordinance with a retroactivity provision."

¶ 35    Village Administrator Robert Kosin testified that he "could not identify any other property but Oakwood Farm[s] which was in violation of the Village's Home Occupation restrictions," and he explained that, "[i]n his tenure at the Village which dates back to 1982, nearly 32 years," he could not "recall an ordinance adopted by the Village with a retroactivity provision included in it."

¶ 36    On December 3, 2014—more than a month before the fact-finding that the Board ordered on October 17 was due—the ZBA voted 4 to 3 to recommend approving the Anderson text amendment. According to Drury's complaint, the ZBA's recommendation "was not accompanied by Findings of Fact which meaningfully addressed the standards and criteria that the [ZBA] is obliged to consider in passing on such a recommendation."

¶ 37    Thereafter, Selman and another Board member called a special meeting for December 15, 2014—a date that Village President Martin McLaughlin, a vocal opponent of the Anderson text amendment—could not attend. At the meeting, the Board approved the Anderson text amendment 5 to 1. Messer, Meroni, and Selman all voted in favor of the amendment.

¶ 38    On January 8, 2015, President McLaughlin vetoed the Anderson text amendment. He explained the basis for his decision in a letter to the Board:

"My opposition to this Text Amendment is well known, and I believe supported by a majority of the residents of the Village of Barrington Hills as evidenced by testimony and written submission to the clerk. I join my fellow residents in being suspect about the reasons for the speed at which the majority of the [ZBA] and the Board of Trustees determined to adopt the Text Amendment at issue—particularly when this issue had been the subject of lengthy debate in 2011, but never formally addressed. I believe the only change in circumstance which forced the series of special meetings to adopt the Text Amendment was a change in legal circumstances for one property owner in the Village. This is not a good reason to change the Village Code and its effect on all residents of the Village. The fact that the Text Amendment is to serve only one resident is brutally apparent given the retroactive nature of the Text Amendment."

¶ 39    On February 23, 2015, the Village Board voted 5-2 to override the President's veto and enacted the Anderson text amendment as "Ordinance 14-19, AN ORDINANCE AMENDING TITLE 5, ZONING REGULATIONS SET FORTH IN CHAPTERS 2, 3, AND 5 REGARDING HORSE BOARDING." See Barrington Hills Ordinance No. 14-19 (approved Feb. 23, 2015), https://barringtonhills-il.gov/records/ordinances/2014Ordinances/Ord_14_19.pdf [https://perma.cc/9XHB-2Y4Z]. Three of the five votes to override President McLaughlin's veto were supplied by Messer, Meroni, and Selman.

¶ 40    Among other things, as enacted, Ordinance 14-19 (1) abrogated our decision in *LeCompte I* by amending the definition of agriculture in the Village code to include breeding, boarding, and training horses as a permitted home occupation as a matter of right and (2) made the amended definition of agriculture retroactive to June 26, 2006.

¶ 41    On February 27, 2015, Drury filed this lawsuit against the Village. The gist of his claim was that Ordinance 14-19 violated substantive due process and was thus facially unconstitutional, because the ordinance was enacted to benefit LeCompte, not to promote the general welfare. Drury alleged that he had standing to sue because, due to LeCompte's horse boarding operation which was now permitted by Ordinance 14-19, both his quiet enjoyment and the value of his property had been diminished.

¶ 42    On April 7, the 2015 consolidated election took place. Selman and Meroni lost their bids for reelection; Messer was not on the ballot. See *Consolidated Election—April 7, 2015*, Lake

County Clerk, http://results.enr.clarityelections.com/IL/Lake/55187/151604/Web01/en/summary.html (last visited Nov.28, 2018) [https://perma.cc/U4D2-CNPM].[1]

¶ 43 In July 2015, the newly constituted Board held a special meeting, during which it scheduled a hearing to vote on settling Drury's suit against the Village.

¶ 44 In August 2015, Pappas, the LeComptes, Barrington Hills Polo Club, Inc., Barbara McMorris, Victoria Kelly, and Mariana & Pasquale Bernardi filed an amended petition to intervene.

¶ 45 In September 2015, the Village held a public hearing to discuss the ongoing litigation and a potential settlement. On October 26, 2015, the Board voted 4 to 2 to pass a resolution approving a settlement agreement with Drury. Among the terms approved by the Board, the settlement contained a finding that Ordinance 14-19 bore no rational relationship to the public health, safety, welfare, or morals and was void *ab initio*. On October 30, 2015, Drury and the Village presented the settlement to the circuit court.

¶ 46 On November 10, 2015, Barrington Hills Farm filed an objection to the proposed settlement. Thereafter, on December 10, 2015, the circuit court granted each petitioner leave to intervene. In January 2016, the intervenors filed motions to dismiss Drury's original complaint, and in February, the intervenors filed objections to the proposed settlement.

¶ 47 In a memorandum opinion and order dated May 3, 2016, the circuit court (1) dismissed Drury's complaint without prejudice and (2) denied Drury and the Village's joint motion to approve the settlement. As to the latter, the court reasoned:

> "Settlement of disputed claims is encouraged by law. *Martin v. Greenville*, 54 Ill. App. 3d 42, 44 (1977). However, in order to accomplish the disposal of a case by settlement 'all of the parties and intervenors must agree to the settlement.' [*Business & Professional People for Public Interest v. Commerce Comm'n*], 136 Ill. 2d 192, 209 (1989).

> * * *

> Absent additional evidence, the court cannot definitively determine whether Defendant Village adequately represented the interests of the Intervenors, parties to the current litigation. However, the substantial and ongoing objections to the Agreement made by Intervenors indicate that Intervenors' interests do not align with the resolution proposed in the Agreement. Intervenors were not privy to settlement negotiation sessions and currently object to the result, so it is reasonable to conclude the Agreement currently does not represent their interests. Despite the court's preference for settlement, it is impractical to adopt a settlement agreement to which all parties involved in the dispute do not consent. For all of the foregoing reasons, the current Agreement cannot be adopted."

¶ 48 Thereafter, Drury filed an amended complaint, which the intervenors moved to dismiss pursuant to section 2-615 of the Code of Civil Procedure (735 ILCS 5/2-615 (West 2016)).

¶ 49 While those motions were pending, the Village filed a verified answer to Drury's complaint. In response to Drury's allegation that "the Text Amendment is an invalid exercise of the Village's police power authority" because the text amendment "does not promote the

---

[1]While this fact was not pleaded in Drury's complaint, we may judicially notice election results. *Ahmad v. Board of Election Commissioners*, 2016 IL App (1st) 162811, ¶ 7.

general welfare but instead was adopted to benefit one property owner," the Village answered: "The Village admits that the Text Amendment does not promote the general public welfare and admits that the Text Amendment benefits a property owner who is engaged in a commercial horse boarding operation within the Village." In addition, at several points in its answer, the Village responded to an allegation by stating:

> "[T]he Village Board, after careful analysis and upon closer scrutiny determined that the Commercial Horse Boarding Text Amendment approved by the Village Board, over the veto of the President, bears no rational relationship to the public health, safety, comfort, morals or general welfare and is otherwise unlawful, in that it alters the residential character of the Village, does not take into consideration the impact of large scale commercial horse boarding on the character of the Village, it does not consider the effect of such on the residential roadways within the Village, relative to traffic in residential areas and the detrimental effect of large trucks on Village roadways, does not take into consideration the potential noise implications of large scale commercial horse boarding on the residential character of the Village, does not impose a limitation on the number of commercial horse boarding facilities within the Village and has a potentially negative impact upon property values within the Village."

¶ 50    On April 27, 2017, the circuit court dismissed Drury's amended complaint with prejudice. The court found that "a substantial portion" of Drury's complaint was "simply inapposite." The court noted, for instance, that the plaintiffs "argue at length that their properties have been harmed by the Text Amendment and that it was enacted solely for the purpose of benefitting one of the intervenors (Benjamin LeCompte) at their expense," but it found that those arguments "sound as *as applied* challenges to a statute, not as *facial* challenges, which as discussed above require pleading that the statute is void on its face in any context, regardless of how it was applied or what impacts it had." And the court found "unpersuasive" Drury's allegations that Ordinance 14-19 was not rationally related to a "valid public goal," explaining, "[r]egulation of this sort of local business is squarely within the rational interests of local governments such as the Village, and the court can see no persuasive reason to declare one policy on the subject over others to be facially invalid."

¶ 51    On May 26, 2017, Drury filed a motion to reconsider, arguing, among other things, that the court erred by failing to consider the Village's answer. On November 9, 2017, the court denied Drury's motion. The court rejected Drury's argument that it should have considered the Village's answer, explaining that, when ruling on a section 2-615 motion, it could "only consider the 'four corners' of the complaint, and that in any event, all allegations are deemed admitted for purposes of a 2-615 motion." This appeal followed.

¶ 52                                                    ANALYSIS
¶ 53    On appeal, Drury challenges the circuit court's orders (1) rejecting the settlement, (2) granting the intervenors' motions to dismiss, and (3) denying his motion to reconsider.

¶ 54                                                 I. Jurisdiction
¶ 55    Before we can proceed to the merits, we must assure ourselves of our jurisdiction. The jurisdictional question before us concerns whether this appeal is moot. Illinois courts' subject-matter jurisdiction extends only to cases that present an actual controversy (*McCormick v. Robertson*, 2015 IL 118230, ¶ 21), and moot cases do not present actual

controversies (*Ferguson v. Patton*, 2013 IL 112488, ¶ 23). "A case on appeal becomes moot where the issues presented in the trial court no longer exist because events subsequent to the filing of the appeal render it impossible for the reviewing court to grant the complaining party effectual relief." *Bettis v. Marsaglia*, 2014 IL 117050, ¶ 8.

¶ 56    Barrington Hills Farm says that this appeal is moot because Ordinance 14-19 was repealed in November 2016. To be sure, " '[a] case might become moot if subsequent events made it absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur.' " *Friends of the Earth, Inc. v. Laidlaw Environmental Services (TOC), Inc.*, 528 U.S. 167, 189 (2000) (quoting *United States v. Concentrated Phosphate Export Ass'n*, 393 U.S. 199, 203 (1968)). And generally, "the repeal of a challenged statute is one of those events that makes it absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur." (Internal quotation marks omitted.) *Coral Springs Street Systems, Inc. v. City of Sunrise*, 371 F.3d 1320, 1331 n.9 (11th Cir. 2004); see *Federation of Advertising Industry Representatives, Inc. v. City of Chicago*, 326 F.3d 924, 930 (7th Cir. 2003) ("[W]e have repeatedly held that the complete repeal of a challenged law renders a case moot, unless there is evidence creating a reasonable expectation that the City will reenact the ordinance or one substantially similar.").

¶ 57    Still, we reject Barrington Hills Farm's mootness argument. Drury is mounting a facial challenge to the ordinance, seeking a declaration that the ordinance is void *ab initio*—meaning it was void from the inception and thus was of no effect. See *In re N.G.*, 2018 IL 121939, ¶ 50 ("When a statute is found to be facially unconstitutional in Illinois, it is said to be void *ab initio*; that is, it is as if the law had never been passed [citations] and never existed."). The repeal of the ordinance prevents its *future* application, but it does not invalidate it from the outset.

¶ 58    That distinction matters to Drury, because LeCompte has not stopped running his large-scale horse boarding operation, even after the repeal of the ordinance; he claims that his rights vested in Ordinance 14-19 when it was adopted and, thus, that vested right survived the ordinance's repeal. He has taken that position here, and he is taking that position in other litigation with Drury, as we noted above. But if Drury is correct that the ordinance is void *ab initio*—it was invalid the moment it passed—then LeCompte cannot even plausibly claim a vested right based on the ordinance. Drury is thus capable of obtaining "effectual relief" from us. See *Bettis*, 2014 IL 117050, ¶ 8. This appeal is not moot.

¶ 59                                   II. Settlement Agreement

¶ 60    Assured of our jurisdiction, we turn to the merits, beginning with Drury's appeal of the circuit court's order refusing to enter judgment on his settlement agreement with the Village. Drury maintains that the circuit court erred by rejecting the settlement because (1) the Village had no duty to represent the intervenors' interests and (2) the intervenors' consent was not necessary for the court to approve the settlement.

¶ 61    The parties disagree over our standard of review. The intervenors suggest that the abuse-of-discretion standard applies. Drury, on the other hand, says that we should review the circuit court's order refusing to enter the settlement agreement *de novo* because the intervenors did not request an evidentiary hearing. We need not resolve this issue, however, because we would affirm the circuit court's ruling under any standard of review.

¶ 62    Drury and the Village asked the court to enter an agreed final judgment in which the Village agreed, among other things, that the ordinance at issue, "at the time of its adoption, [bore] no rational relationship to the public health, safety, comfort, morals or general welfare and [was] otherwise unlawful," and that the ordinance "was at the time of its adoption unreasonable, unlawful, null and void *ab initio*."

¶ 63    There are two distinct reasons why we agree with the circuit court's rejection of the settlement agreement. The first is that the Village's purported agreement with Drury crossed the line when it declared that the ordinance, though duly and lawfully adopted, was "at the time of its adoption *** null and void *ab initio*." The Village was agreeing with Drury, in other words, that the ordinance was facially unconstitutional. See *In re N.G.*, 2018 IL 121939, ¶ 50.

¶ 64    The Village has no authority to declare an ordinance facially unconstitutional or, for that matter, unconstitutional in any sense. The power to declare an ordinance unconstitutional is an inherently judicial power, one reserved exclusively to the courts. *Perlstein v. Wolk*, 218 Ill. 2d 448, 459 (2006); *People v. Gersch*, 135 Ill. 2d 384, 398-99 (1990); *People v. Jackson*, 69 Ill. 2d 252, 256 (1977). It necessarily follows that "[i]f the power is judicial in character, the legislature is expressly prohibited from exercising it." *Jackson*, 69 Ill. 2d at 256; accord *People v. Bruner*, 343 Ill. 146, 157-58 (1931).

¶ 65    The Village could repeal its own ordinance, of course. It could take the legal position in court, as it did here, that the ordinance is unconstitutional. It could, in certain circumstances, enter into a settlement or consent decree spawned by the claim of unconstitutionality, with the court's approval. See, *e.g.*, *People ex rel. Fahner v. Colorado City Lot Owners & Taxpayers Ass'n*, 106 Ill. 2d 1, 4-5 (1985). But the Village has no authority to declare, on its own, that an ordinance it adopted violated the constitution and thus was void from its inception—that it never existed.

¶ 66    Of course, if the trial court *agreed* with the Village and Drury that the ordinance was unconstitutional, it could enter an order to that effect, by its own order (the typical case) or by agreed order. But we emphatically reject the notion that the trial court was *required* to enter that order, or that it even could have conceivably abused its discretion in refusing to do so, before it had made its own independent determination as to the constitutionality of that ordinance.

¶ 67    And second, even if the Village somehow possessed that authority, it had no authority to settle that claim over the objection of a codefendant defending the same claim. Once the intervenors were granted to leave to appear as party-defendants, they had the same rights as the Village. See *In re Marriage of Johnson*, 97 Ill. App. 3d 634, 635 (1981) ("[A]n intervenor has all of the rights of an original party."). And they were defending precisely the same claim—that the ordinance was unconstitutional.

¶ 68    It would be a different story if multiple defendants faced separate claims and the settlement of one of the claims with one of the defendants had no impact on the other defendants and the other claims. Take a simple example: A plaintiff sues two different newspapers for defamation, each for a separate act of publishing the defamatory statement. A plaintiff could settle with one defendant without the other's consent, because the settlement with one defendant did not affect the interests of the codefendant in any way.

¶ 69    But here, the intervenors and the Village were defending precisely the same claim of unconstitutionality. The Village could not settle the case over the objection of the intervenors, any more than the intervenors could have done so without the Village's consent. See, *e.g.*,

*Wheeling Trust & Savings Bank v. Village of Mount Prospect*, 29 Ill. App. 3d 539, 541-42 (1975) (reversing entry of agreed zoning order between plaintiff and village and permitting neighboring landowners to intervene to contest settlement); *Freesen, Inc. v. County of McLean*, 277 Ill. App. 3d 68, 74 (1995) (reversing denial of petition to intervene, ordering that intervenors be "allowed to present evidence attacking the purported settlement order" between county and plaintiff regarding zoning of plaintiff's property).

¶ 70    We uphold the circuit court's order sustaining the intervenors' objections to the settlement.

¶ 71                               III. Dismissal of Complaint

¶ 72    We next consider Drury's argument that the circuit court erred by dismissing his complaint pursuant to section 2-615 of the Code of Civil Procedure. A section 2-615 motion tests the legal sufficiency of a complaint. *Schweihs v. Chase Home Finance, LLC*, 2016 IL 120041, ¶ 27. "In ruling on such a motion, only those facts apparent from the face of the pleadings, matters of which the court can take judicial notice, and judicial admissions in the record may be considered." *Pooh-Bah Enterprises, Inc. v. County of Cook*, 232 Ill. 2d 463, 473 (2009). The court must take as true all well-pleaded facts in the complaint (*Schweihs*, 2016 IL 120041, ¶ 27) and dismiss only if "it is clearly apparent that no set of facts can be proved that would entitle the plaintiff to relief." *Pooh-Bah*, 232 Ill. 2d at 473. Our review is *de novo*. *Id.*

¶ 73    Drury claims that Ordinance 14-19 was an invalid exercise of the Village's police power in violation of the due process clause of the Illinois Constitution and its federal counterpart, made applicable to the states via the fourteenth amendment to the United States Constitution. See Ill. Const. 1970, art. I, § 2; U.S. Const., amend. XIV.

¶ 74    The police power is an "attribute of sovereignty in every government by which it may protect lives, health, morals and general welfare." *Sherman-Reynolds, Inc. v. Mahin*, 47 Ill. 2d 323, 326 (1970); *People v. John Doe of Rosehill Cemetery Co.*, 334 Ill. 555, 560 (1929) ("The police power is the power of the sovereign to legislate in behalf of the public health, morals, or safety by general regulations reasonably adapted to the object in view without creating arbitrary discriminations between different classes of men or things."). As a home-rule unit, the Village's police power emanates from the Illinois Constitution. Specifically, section 6 of article VII provides: "[A] home rule unit may exercise any power and perform any function pertaining to its government and affairs including, but not limited to, the power to regulate for the protection of the public health, safety, morals and welfare." Ill. Const. 1970, art. VII, § 6(a).

¶ 75    The police power is broad. *Kalodimos v. Village of Morton Grove*, 113 Ill. App. 3d 488, 492-93 (1983) ("A municipality has broad discretion to determine not only what the interests of the public welfare require but what measures are necessary to secure those interests."), *aff'd*, 103 Ill. 2d 483 (1984). Indeed, "[t]he concept of the public welfare is broad and inclusive." *Berman v. Parker*, 348 U.S. 26, 33 (1954); see *Moore v. City of East Cleveland*, 431 U.S. 494, 498 n.6 (1977) ("the general welfare is not to be narrowly understood; it embraces a broad range of governmental purposes"). Zoning regulations are, first and foremost, the province of the legislature, falling squarely within that police power. *Quilici v. Village of Mount Prospect*, 399 Ill. 418, 423 (1948) ("Municipalities may adopt zoning ordinances as an exercise of their police power."); *Berman*, 348 U.S. at 32 ("the legislature, not the judiciary, is the main guardian of the public needs to be served by social legislation").

¶ 76       When evaluating a substantive due process challenge to a zoning ordinance, the judiciary's role is "an extremely narrow one." *Berman*, 348 U.S. at 32. "It is not for us to reappraise" the balancing of various policy considerations (*id.* at 33) or to inquire into the wisdom or soundness of a legislative determination (*Village of Euclid v. Ambler Realty Co.*, 272 U.S. 365, 395 (1926)). Rather, " '[i]f the validity of the legislative classification for zoning purposes be fairly debatable, the legislative judgment must be allowed to control.' " *Napleton v. Village of Hinsdale*, 229 Ill. 2d 296, 311 (2008) (quoting *Euclid*, 272 U.S. at 388); see also *Hannifin Corp. v. City of Berwyn*, 1 Ill. 2d 28, 35 (1953) ("This court has no right to question legislative policy," and thus zoning decisions "will not be held unreasonable where there is room for a fair difference of opinion on the question").

¶ 77       Absent some classification based on factors like race or gender that invoke a higher level of scrutiny (not applicable here), courts employ the rational-basis test in reviewing zoning restrictions. *Napleton*, 229 Ill. 2d at 319. The zoning restriction "will be upheld if it bears a rational relationship to a legitimate legislative purpose and is neither arbitrary nor unreasonable." *Id.* (citing *Village of Lake Villa v. Stokovich*, 211 Ill. 2d 106, 122 (2004)).

¶ 78       At times, the courts have phrased the test differently in the context of zoning restrictions, stating that zoning ordinances bearing "no substantial relation to the public health, safety, morals, or general welfare" are constitutionally invalid. *Euclid*, 272 U.S. at 395; see also *Trust Co. of Chicago v. City of Chicago*, 408 Ill. 91, 98 (1951); *Kennedy v. City of Evanston*, 348 Ill. 426, 433 (1932). Our supreme court has clarified that this "substantial relation" language is "simply an alternate statement of the rational basis test." (Internal quotation marks omitted.) *Napleton*, 229 Ill. 2d at 315. That is, "the intent of the 'substantial relation' inquiry is to ensure that the challenged zoning ordinance is rational and is not arbitrary or capricious." *Id.*

¶ 79       To be sure, the rational-basis test is, by a comfortable margin, the most forgiving mode of analysis known to American constitutional law. *People v. Johnson*, 225 Ill. 2d 573, 585 (2007). But it is not a rubber stamp. *People v. Boeckmann*, 238 Ill. 2d 1, 7 (2010) ("Rational basis review is highly deferential, but it is not 'toothless.' " (quoting *People v. Jones*, 223 Ill. 2d 569, 596 (2006), quoting *Mathews v. De Castro*, 429 U.S. 181, 185 (1976))). That has proven especially true in the context of substantive due process challenges to zoning restrictions.

¶ 80       For example, in *Cosmopolitan National Bank of Chicago v. City of Chicago*, 27 Ill. 2d 578, 580, 586 (1963), our supreme court invalidated a 1958 ordinance that rezoned certain property to a classification that did not permit funeral uses. Only a year earlier, the city had passed a comprehensive zoning ordinance that continued to allow funeral uses. *Id.* at 580. Plaintiff, the owner of a funeral home, challenged the 1958 ordinance, claiming that it was passed at the behest of a small group of citizens, that the city failed to follow its notice-and-hearing procedures when adopting it, and that the city failed to follow its own regulations that deemed an ordinance denied if not acted upon within six months (the 1958 ordinance languished for eight months before adoption). *Id.* Our supreme court held that the ordinance was not sufficiently related to the public welfare. Among other things, the court noted the city's violation of its own procedures regarding the six-month limit and the notice-and-hearing procedures. *Id.* at 583. The court continued:

       "The evidence shows there was no change in either the general character or the existing uses in the neighborhood in the interim between the passage of the comprehensive amendatory ordinance of 1957 and the 1958 amendment rezoning plaintiffs' land, which in any manner relates the change of zoning to the public need or

demand. Instead, the only affirmative showing is that the proposal to change the zoning of the property from its B4-1 classification emanated from the desires of certain individuals that such a change be effected. We have consistently held, however, that the power to zone or rezone cannot be exercised to satisfy the individual desires of a few. [Citations.] Considering all the facts and circumstances, they do not show such a demand for the public need or good which would serve to justify the change of the B4-1 classification of plaintiffs' property." *Id.* at 584-85.

¶ 81    In *Trust Co. of Chicago*, 408 Ill. at 94-95, the plaintiff bought property in Chicago that, since 1923, had been zoned as an "apartment district" and on which he intended to build an apartment building. In 1942, the city amended its zoning code to change the zoning classification for half a block of territory, which included the plaintiff's property, from apartment use to single-family residential. *Id.* at 95. The circuit court found the amendatory ordinance unconstitutional as applied to the plaintiff's property.

¶ 82    Our supreme court affirmed. The court found "no actual or reasonable connection between the rezoning of plaintiffs' property from apartment to single-family residence and the public health, safety, comfort, morals or welfare." *Id.* at 101. The court noted that "undisputed testimony contained in the record" showed that

> "the erection of a multistoried apartment building on plaintiff's property would in no way injure or detract from the general welfare of the city or the general welfare of the community wherein the property is situated or from the general welfare of any community or neighborhood adjacent to said property, when the city or any such community is considered as a whole; and it is as a whole that a municipality or a community must be considered when zoning laws and ordinances are involved." *Id.* at 101-02.

The court then delivered its punch line:

> "The conclusion in this case is inescapable *** that the city, in rezoning the properties here affected and also in defending such rezoning in this court, was not seeking to promote or preserve the general welfare but was seeking to bestow upon the individual residents of the rezoned properties special benefits in that they might continue in their 'oasis of gracious family living,' free from what they might regard as the nuisance of apartment buildings in the block. This action of the city under the rezoning ordinance of 1942 finds no justification in any aspect of the police power asserted for the public good. The public good means more than the special benefits from a zoning ordinance which are conferred only upon a few. It is not the purpose of the zoning law to permit special privileges to a few property owners." *Id.* at 103-04.

¶ 83    In *Phipps v. City of Chicago*, 339 Ill. 315, 319 (1930), the stipulated facts showed that the plaintiff purchased property zoned for industrial and manufacturing purposes. Nine months later, entities wanting to build apartment buildings sought a zoning amendment that would reclassify that property as residential. *Id.* A public hearing was held on the proposed ordinance, but it took place before an inferior city commission that lacked the authority to hold such a hearing, and proper notice of the hearing was not given. *Id.* at 319-20. The city ultimately adopted the zoning amendment. *Id.* at 320.

¶ 84    The lower court found "evidence tending to show that the amendment was made because certain parties wanted it made so they could build more buildings for residence purposes" and reasoned that the city's power to amend its zoning laws was "not arbitrary and could not be

- 15 -

exercised merely because someone wanted it done or thought it ought to be done. It could only be exercised when the public good demanded or required that the amendment be made." *Id.* at 327. The lower court thus invalidated the zoning ordinance, and the supreme court adopted the reasoning and holding in full. *Id.*

¶ 85    In *Kennedy*, 348 Ill. at 430-31, the supreme court invalidated a 1929 amendment to a zoning law that permitted the building of apartment buildings (a B-classification) in an area of Evanston, Illinois, previously zoned exclusively for single-family residential housing (an A-classification). The evidence showed that little to no change had occurred between the last time the city was rezoned and the 1929 ordinance, that "[n]o reason [was] shown" to justify changing the territory from A-use to B-use (*id.* at 432), and that "[n]o showing ha[d] been made why the vacant and poorly-improved land in the 'B' use district cannot be used for apartment houses before it is necessary to encroach on the 'A' territory" (*id.* at 433).

¶ 86    Evanston argued that "a majority of the property owners in and adjoining the district" wanted the zoning amendment, but our supreme court held that the zoning power was not "arbitrary," that it "cannot be exercised merely because certain individuals want it done or think it ought to be done. The change must be necessary for the public good." *Id.*

¶ 87    Intervenors, on the other hand, argue that dismissal here was appropriate under *Napleton*, 229 Ill. 2d at 300-01, where the plaintiff facially challenged a Hinsdale ordinance that rezoned certain property to exclude beauty salons and financial institutions from the ground floors of properties. The ordinance came after a temporary moratorium imposing the same restriction, followed by a study commissioned by Hinsdale "to assess the impact of beauty salons and financial institutions on taxable retail sales" in these zoning districts. *Id.* at 301. According to the complaint, the study recommended that no additional credit institutions be allowed to locate on the ground floor in certain zoning districts but did not make that recommendation for "B-1" or "B-3" zoning districts, where the plaintiff owned property. *Id.* at 302.

¶ 88    The plaintiff alleged not only that she would lose hundreds of thousands of dollars in lost rent but that several existing buildings in these zoned areas would now be nonconforming. *Id.* at 302-03. She also alleged that the amendments were passed to satisfy a few individuals, that there was " 'no community need' " for the rezoning, that it would not benefit the public in any way, and thus that it was unconstitutionally arbitrary and not substantially related to the public welfare, violating her substantive due process rights under the Illinois Constitution. *Id.* at 303. The supreme court affirmed the dismissal of the facial challenge, employing traditional rational-basis scrutiny, by which it would uphold the ordinance as long as it bore a "rational relationship to a legitimate legislative purpose" and was "neither arbitrary nor unreasonable." *Id.* at 319.

¶ 89    The allegations that the zoning amendments were " 'arbitrary, capricious and irrational,' " and that they were adopted at the behest of a few individuals and not for the public welfare, were not supported by facts and thus amounted to conclusory allegations. *Id.* at 319-20. Likewise, the allegations that there was " 'no community need' " for the ordinance, and that Hinsdale took little to no care in planning the amendments, lacked any factual basis. *Id.* at 320. Finally, the court noted from the exhibits to the complaint that Hinsdale had gathered information for months, commissioned a study, and received input from its planning commission before acting. *Id.* at 321. The court determined that it was reasonable for Hinsdale to balance the inclusion of retail businesses that provide sales-tax revenue with those that do not, and the zoning ordinance was "rationally related" to that purpose. *Id.*

¶ 90    We agree with Drury that the facts of this case have less in common with *Napleton* and bear a far more striking similarity with *Trust Co. of Chicago*, *Phipps*, and *Cosmopolitan National Bank*. Each of those cases dealt with a municipality's attempt to thwart a private landowner from using his property in a permissible way by rezoning to make that use impermissible. See *Cosmopolitan National Bank*, 27 Ill. 2d at 580, 584-85 (preexisting funeral home located in area long zoned to permit that use before city rezoned it to exclude funeral uses, without conducting proper hearings or providing any valid justification); *Trust Co. of Chicago*, 408 Ill. at 94-95, 103-04 (city rezoned half of city block to stop plaintiff from building apartment building for "inescapable" reason that neighboring homeowners did not want apartments built); *Phipps*, 339 Ill. at 327 (stipulated that city rezoned from industrial to residential certain property that plaintiff had purchased for industrial purposes because certain entities wanted to build apartment buildings on it).

¶ 91    Those cases are, in one sense, the inverse of the facts alleged here. Drury does not allege that the Village rezoned to injure a particular property owner but rather to *advantage* one, LeCompte. But we don't see that as a meaningful distinction. If a rezoning decision is made for a purpose other than furthering the public welfare, it makes no difference whether that reason was to hurt a property owner or to help one; what matters is that the zoning restriction is not reasonably related to the public welfare, whatever the "true" reason may be. The singular focus is on whether the public welfare justifies the zoning restriction. Even if, as in *Kennedy*, 348 Ill. at 433, a *majority* of the affected citizens want the zoning change, it still "must be necessary for the public good."

¶ 92    Those cases are far older than *Napleton*, and it might be fair to speculate that zoning considerations were different in the early to middle half of the twentieth century than in the mid-2000s in *Napleton* or, as here, 2015. But we do not have the luxury of disregarding decisions of our supreme court because they might feel dated. And however different zoning considerations may have been in the 1920s or 1950s, we see no reason why the principles animating those decisions would not still be relevant. Indeed, if the complaint's allegations here are true, as we assume them to be at the pleading stage, the same kinds of things that happened a hundred years ago may still be happening today.

¶ 93    More importantly, nothing in *Napleton* suggests that cases like *Cosmopolitan National Bank*, *Phipps*, *Trust Co. of Chicago*, and *Kennedy* are bygones of a different era. As in those cases, the plaintiff in *Napleton*, 229 Ill. 2d at 319-20, alleged that Hinsdale's rezoning was adopted to satisfy the desires of a few individuals, that there was no community need for it, and that Hinsdale conducted no meaningful care in planning it. The supreme court did not hold or even hint that those allegations were meaningless or irrelevant. The problem was that they were conclusory—unsupported by facts as required under Illinois law. *Id.* Indeed, the circuit court gave the plaintiff an opportunity to replead with more specificity, but she declined. *Id.* at 320. If the qualitative nature of the plaintiff's allegations was legally insufficient to state a claim, the vast majority of the court's analysis in *Napleton* would have been unnecessary. What is more, the accompanying exhibits demonstrated that Hinsdale had a legitimate public-policy interest (the need for sales-tax revenue) and that it followed a careful, studied route to a zoning decision that was rationally related to that interest. *Id.* at 321.

¶ 94    What is alleged here, suffice it to say, is different by a considerable degree from the allegations in *Napleton*. We emphasize again that we take the allegations as true at this stage, but taking them as true, they allege a number of critical points with factual specificity.

¶ 95   The first well-pleaded fact is that the ordinance was passed for the exclusive benefit of LeCompte. The complaint does not just baldly assert this fact. For one thing, it quotes the Village president's veto message that said as much. But most significant in that regard is the 8½-year retroactivity provision of the ordinance, which the complaint (quoting Village officials and testifying experts at the public hearing) alleges benefitted LeCompte and only LeCompte, what the circuit court aptly described as a "legislative pardon" by wiping out LeCompte's fines for violating the 2006 Ordinance since 2008. Likewise quoting Village officials on the record, the complaint alleges that such a retroactivity provision was unparalleled in Village history. The complaint, in other words, adequately alleges that the ordinance contained unprecedented language designed for the exclusive benefit of LeCompte.

¶ 96   The timing of the ordinance can also be relevant in determining whether the ordinance was passed to promote the public welfare or whether it was passed to single out a particular individual for favor or disfavor. See *Kennedy*, 348 Ill. at 433-34 ("The action of the zoning commission in recommending the amendment in the fall of 1928 after having denied a similar petition earlier in the same year might be attributed to the fact that certain property owners agreed to the widening and paving of the streets provided the reclassification was made. These agreements not only fail to show that the amendments to the ordinance were passed for the public good, but they tend to show that they were passed in deference to the wishes of certain individuals."); *cf. Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 540 (1993) (fact that city failed to take any action to address its asserted problem with animal sacrifice until after Santeria church announced plans to open was evidence that city's law prohibiting ritual animal sacrifice was enacted to suppress Santeria religious practice).

¶ 97   Here, the complaint alleges, it was only after his legal prospects in court were dimming that, in August 2014, LeCompte sought a legislative solution via the LeCompte text amendment. That amendment, the complaint alleges, was the predecessor of Ordinance 14-19 that was ultimately adopted by the Board. The fact that the Village acted only at that particular time, considering the years-long court battles over its horse boarding ordinance, is at least a relevant consideration that the ordinance was adopted with LeCompte's particular interests, not the public's at large, in mind.

¶ 98   We should be clear here: There is nothing wrong, in and of itself, with supporting an ordinance, or even supporting an ordinance that favors you (what better ordinance to support?). Likewise, the fact that only one person or entity petitioned for the ordinance (if in fact that is true) does not *necessarily* mean that the ordinance was *not* adopted for the public welfare. There is no hard-line rule here. A zoning restriction could be good for the public at large even if only one person asked for it, just as a zoning restriction may *not* be in the public welfare even if a majority of the affected citizens support it. See *Kennedy*, 348 Ill. at 433.

¶ 99   We have said it already but it is worth repeating: The only question, at bottom, is whether the ordinance is rationally related to the public welfare, regardless of who or how many people wanted it. But having said that, one consideration—not a dispositive fact but a consideration—in making that determination is whether the municipality was acting at the behest of an isolated individual or group of individuals. And when the record shows, as alleged here, that the *only* justification for the ordinance is that a chosen few individuals wanted it, our supreme court has typically invalidated that ordinance. See, *e.g.*, *Trust Co. of Chicago*, 408 Ill. at 103-04; *Phipps*, 339 Ill. at 327; *Cosmopolitan National Bank*, 27 Ill. 2d at 584-85; *Kennedy*, 348 Ill. at 433-34.

¶ 100 Another relevant consideration is whether the Village deviated from its standard procedures in adopting Ordinance 14-19. See, *e.g.*, *Cosmopolitan National Bank*, 27 Ill. 2d at 583 (considering fact that city failed to follow its own notice-and-hearing procedures and its own rule deeming ordinance defeated if not acted upon within six months); *Napleton*, 229 Ill. 2d at 321 (upholding Hinsdale ordinance in part because village "enacted the challenged amendments to its zoning code after months of gathering information, commissioning a study *** , holding meetings and public hearings, and receiving input and approval from its Plan Commission"); *Cine SK8, Inc. v. Town of Henrietta*, 507 F.3d 778, 790 (2d Cir. 2007) (reversing grant of summary judgment to municipality in case alleging substantive due process violation arising from municipality's decision to amend special-use permit because, among other things, "the process the Town Board used to [amend the permit] seemingly failed to comply with the procedural requirements of the [Town] Code"); *MLC Automotive, LLC v. Town of Southern Pines*, 532 F.3d 269, 281 (4th Cir. 2008) (in ruling on substantive due process challenge to zoning enactment, court may consider whether government's decision is "tainted with fundamental procedural irregularity").

¶ 101 The complaint alleges procedural irregularities in the Village's adoption of Ordinance 14-19—namely that the Village adopted the ordinance without obtaining sufficient facts from the ZBA that were required by law and that the Village, itself, had specifically requested from the ZBA.

¶ 102 Recall that when the LeCompte text amendment first came before the Board in September 2014, the Board postponed consideration of the amendment in response to a number of objections raised at the public hearing—namely that the ZBA failed to gather enough information and properly review the amendment before approving it. On October 17, 2014, the Village Board ordered the ZBA, within 90 days, to answer a detailed series of questions about allowing commercial horse boarding as a matter of right village-wide, including:

—the number of horses that should be allowed, with a recommendation to consult experts on equestrian husbandry;

—the property tax impact, with a recommendation to consult a local assessor;

—whether allowing commercial horse boarding would create the potential for additional commercial activities in the Village, with a recommendation to consult the Village's land-use consultant;

—the effect of a village-wide permit versus an individualized special-use permit as previously advocated by the chairman of the ZBA in 2011, another question to be asked of the land-use consultant;

—the effect of traffic loads and volume on the Village's roads, with a suggestion to consult the Village engineer;

—the effect on the aquifer of large-scale commercial boarding, with a recommendation to consult the Barrington Area Council of Governments;

—the role of the Village's building department in implementing the ordinance; and

—the hours of operation that would be allowed and whether they should be uniform.

¶ 103 These appear to be reasonable and important issues that a responsible municipality would want to consider before making a significant change to its zoning laws. Yet only three days later, on October 20, 2014, ZBA member Kurt Anderson introduced his own text amendment

that was all but identical to the LeCompte text amendment—the same village-wide permit for commercial boarding, the same 8½-year retroactivity provision.

¶ 104    Then, on December 2, 2014, the ZBA held a hearing on the Anderson text amendment, at which (according to the complaint) no witness testified that the amendment promoted the public welfare. The expert land planner testified that he had no opinion, that it would be premature to offer such an opinion absent "much further study involving *** an interdisciplinary team." He also testified that he was unaware of any community that permitted large-scale commercial horse boarding as a matter of right and that five similar municipalities with which he was familiar—Mettawa, Wayne, Bull Valley, Homer Glenn, and Wadsworth—all used the more individualized special-use approach. Nevertheless, the ZBA voted to recommend the Anderson text amendment the next day.

¶ 105    Less than a week later, on December 8, the ZBA issued this document along with its recommendation:

> "The ZBA, after having examined the Application for Text Amendment, with revisions proposed by Member Anderson, and taking into consideration the testimony heard in the public hearing for horse boarding, adopted the following findings as to the Text Amendment:
>
> That the text amendment, as proposed, addresses the concerns of the health, safety, and Welfare of the community arising out of the breeding, boarding, and training of horses and riders within the village. It's designed to eliminate or address the issues of nuisance as well as traffic and safety for residences of the village."

¶ 106    That document was apparently an attempt to comply with section 5-10-6 of the Village code, which provides:

> "Findings of Fact and Recommendations of the Zoning Board of Appeals: Within a reasonable time after the close of the hearing on a proposed amendment, the Zoning Board of Appeals *shall make written findings of fact* and shall submit same together with its recommendation to the Board of Trustees of the Village." (Emphasis added.)

¶ 107    The "findings of fact" issued by the ZBA in regard to the Anderson text amendment are, to say the least, quite short on the required "facts." It would be more accurate to say that this document was nothing but a curt conclusion designed to satisfy the constitutional requirement that zoning ordinances bear a rational relationship to the public welfare. It was a conclusion without any facts. It did not comply with the Village code's requirement for "findings of fact."

¶ 108    Regardless, two members of the Board then called for a special meeting to vote on the Anderson text amendment on December 15, 2014. Though a month still remained on the Board's request for the ZBA to answer its series of questions regarding commercial horse boarding, with none of them yet answered, and despite the fact that the ZBA had not provided anything close to what could be described as "findings of fact" to support its recommendation, the Board adopted the Anderson text amendment that night.

¶ 109    The complaint thus alleges that the Village ignored its own procedural requirements and ignored even its own independent request for more detailed study of the question and rushed through the amendment's passage. Like the other factors we have discussed above, the legislative machinations described above are by no means dispositive, in and of themselves. The Board members could have changed their mind and decided they no longer needed answers to the questions they had submitted to the ZBA, that they had enough information

even without the ZBA providing any findings of fact. Still, the fact that the Board, according to the complaint, rushed through an amendment, after identifying several reasonable and important concerns but then failing to resolve them, is at least a relevant factor in determining whether Ordinance 14-19 was adopted for the public welfare or for unrelated reasons.

¶ 110     Another factor to consider, of course, is that the Board repealed the ordinance a year later. The repeal of an ordinance does not necessarily mean that the previous ordinance was unrelated to the public welfare. It does not automatically follow that if the Board, in 2016, determined that it "serves the interests of the Village" to remove the language permitting large-scale horse boarding as of right, that this means it was *not* in the public interest to allow those operations in 2015. These are matters of judgment and opinion by the elected officials currently holding office; legislative bodies change membership from time to time, as here, and the same legislators can change their minds. That is why judges will defer to those legislative decisions as long as the question of the public welfare is at least a debatable one. See *Euclid*, 272 U.S. at 395; *Napleton*, 229 Ill. 2d at 311; *Hannifin*, 1 Ill. 2d at 35.

¶ 111     But the complaint alleges that the public welfare had nothing to do with Ordinance 14-19. It alleges that the ordinance was passed for one man, and as we have already explained, it contains sufficient allegations to support that claim. It would make no sense, in determining whether Ordinance 14-19 was adopted for the public welfare, to completely ignore the fact that the Board, just less than a year after its adoption, determined that it was in the public interest to repeal that legislative act and restore the *status quo ante*.[2]

¶ 112     Finally, it is no small matter to consider the stated justification for the ordinance—or rather the lack thereof. After all, a court cannot determine whether an ordinance is "rational[ly] relat[ed] to a legitimate legislative purpose" (*Napleton*, 229 Ill. 2d at 319) until it has identified that legislative purpose. Usually, that purpose is identified by the governmental unit defending

_____

[2]Although our discussion of the Village's reasons for adopting Ordinance 14-19, divined by reference to the legislative background and procedures, is drawn primarily from the Illinois Supreme Court cases we have discussed throughout this opinion, we would further note that these considerations are consistent with *Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252 (1977). There, the Supreme Court acknowledged the difficulty of ascertaining a legislative body's impermissible motivation and explained that the determination of whether a legislative body acts for a certain (impermissible) reason "demands a sensitive inquiry into such circumstantial and direct evidence of intent as may be available." *Id.* at 266. The "subjects of proper inquiry in determining whether" the legislature acted with a certain purpose include (1) "[t]he historical background of the decision ***, particularly if it reveals a series of official actions taken for invidious purposes," (2) "[d]epartures from the normal procedural sequence," (3) "[s]ubstantive departures" from the normally accepted decisional criteria, "particularly if the factors usually considered important by the decision-maker strongly favor a decision contrary to the one reached," and (4) "[t]he specific sequence of events leading up the challenged decision," such as, for example, a change to a longstanding zoning policy immediately after a disfavored group attempts to avail itself of the existing policy. *Id.* at 267-68. *Arlington Heights* was an equal protection case alleging racial discrimination in zoning, not a substantive due process claim alleging arbitrary zoning action. We base our analysis on the Illinois Supreme Court cases we have discussed, but *Arlington Heights* nevertheless supports our inquiry as well. See *Gamble v. City of Escondido*, 104 F.3d 300, 307 (9th Cir. 1997) (explaining, in course of resolving due process and equal protection challenges to city's refusal to grant building permit to plaintiff, that " '[t]he rational basis test is identical under the two rubrics [of equal protection and due process].' " (quoting *Munoz v. Sullivan*, 930 F.2d 1400, 1404 (9th Cir. 1991))).

the challenged law. Here, of course, the Village has (now) taken the position that no legitimate public interest was served by the ordinance, that it was done only for LeCompte's benefit. The intervenors, defending an ordinance that the Village will not, argue that the purpose of Ordinance 14-19 was to clarify an unclear 2006 Ordinance.

¶ 113    The intervenors may ultimately be correct. But we cannot say as much at the pleading stage, as a matter of law, given the numerous allegations in the complaint that adequately allege that this ordinance was passed for the benefit of only one person and given that the Village itself disclaims any rational basis (much less the intervenors' asserted basis) for having adopted that ordinance.

¶ 114    Of course, we express no view on the truth of these allegations. Nor have we reviewed the entire legislative record pertaining to this ordinance; we have only been given isolated quotes and references in the complaint. And we recognize the possibility, as we have tried to emphasize above, that some of the allegations will be proven true, yet the trial court might still find, overall, that Ordinance 14-19's adoption was within the public interest. But there is enough here to state a claim. The substantive due process challenge should not have been dismissed at the pleading stage. The parties should have the opportunity to put forward their respective positions on the justifications for the ordinances, or lack thereof, in the trial court, bearing in mind that the burden of proof lies with the party challenging the ordinance. See *id.* at 306.

¶ 115    One final note: the intervenors, as did the circuit court, focus on the fact that the claim raised here was a facial challenge, not an as-applied challenge. There are differences between the two claims, to be sure. And a facial challenge is the most difficult challenge to successfully mount, because "an enactment is facially invalid only if no set of circumstances exists under which it could be valid." *Id.* at 305-06. But the allegations here are appropriately suited to a facial challenge. If Drury can establish that Ordinance 14-19 was not rationally related to the public welfare, then the ordinance was void from the outset; it could not be constitutionally applied in any context, regardless of the ordinance's impact on any particular resident of the Village.

¶ 116    To say that something is a "facial" challenge is not to say that judicial review is limited to the "face" of the ordinance; that classification merely speaks to the ambitious remedy it seeks, an invalidation of the statute in all respects. See *id.*; *Citizens United v. Federal Election Comm'n*, 558 U.S. 310, 331 (2010); *Paul v. County of Ogle*, 2018 IL App (2d) 170696, ¶ 28. So any notion that Drury is unable to present evidence that Ordinance 14-19 bore no substantial relation to the public welfare, based on the allegations we have discussed above—LeCompte being the sole beneficiary of at least part of the ordinance, the background leading up to the ordinance's passage, the legislative and procedural machinations, etc.—simply because his challenge is a "facial" one, is incorrect.

¶ 117                                                    CONCLUSION

¶ 118    The trial court's order sustaining the intervenors' objection to the agreed settlement order is affirmed. The dismissal of the substantive due process challenge is reversed. This cause is

remanded for further proceedings consistent with this opinion.[3]

¶ 119 Affirmed in part, reversed in part, and remanded.

_____

[3]Drury's complaint made oblique reference to a takings and equal protection claim. However, to the extent Drury intended to raise a takings or equal protection claim, Drury forfeited those claims by failing to advance any argument on their behalf in his appellate brief. Ill. S. Ct. R. 341(h)(7) (eff. May. 25, 2018) ("Points not argued are forfeited and shall not be raised in the reply brief, in oral argument, or on petition for rehearing."). In the absence of any reason to do otherwise, we affirm the dismissal of those claims.