2021 IL App (1st) 191977
No. 1-19-1977

SIXTH DIVISION
March 5, 2021

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

| | | |
|---|---|---|
| BRIAN J. STRAUSS, Individually and d/b/a 1572 North Milwaukee Avenue Building Corporation, an Illinois Corporation, | ) ) ) ) | Appeal from the Circuit Court of Cook County. |
| Plaintiff-Appellant, | ) ) ) | |
| v. | ) ) | No. 18 CH 00256 |
| THE CITY OF CHICAGO, a Municipal Corporation, | ) ) ) ) | |
| Defendant-Appellee. | ) ) | Honorable David B. Atkins, Judge Presiding. |

JUSTICE CONNORS delivered the judgment of the court, with opinion.
Justices Harris and Oden Johnson concurred in the judgment and opinion.

**OPINION**

¶ 1    Plaintiff, Brian J. Strauss, individually and d/b/a 1572 North Milwaukee Avenue Building Corporation, owned and operated a building located at 1572 North Milwaukee Avenue in Chicago in which Double Door Liquors (Double Door), a music venue, had been a tenant. After Double Door was evicted, a zoning ordinance was enacted that changed the kinds of establishments that were allowed in the building. In his second amended complaint, plaintiff raised claims that challenged the ordinance and certain acts done by the local alderman and defendant, the City of Chicago, before the ordinance was enacted. The circuit court dismissed those claims under section

2-619.1 of the Code of Civil Procedure (Code) (735 ILCS 5/2-619.1 (West 2016)). On appeal, plaintiff contends that (1) the complaint sufficiently stated claims that the zoning ordinance violated substantive due process and equal protection under the Illinois Constitution, (2) the complaint sufficiently stated a claim for inverse condemnation, and (3) his tort claims are not barred by the Local Governmental and Governmental Employees Tort Immunity Act (Tort Immunity Act) (745 ILCS 10/1-101 *et seq.* (West 2016)).

¶ 2                                I. BACKGROUND

¶ 3                        A. Plaintiff's Second Amended Complaint

¶ 4      Plaintiff alleges that the alderman for the ward where the building was located, Proco Joe Moreno, engaged in a course of conduct designed to punish plaintiff for evicting Double Door. In July 2017, plaintiff filed a federal civil rights complaint in the United States District Court for the Northern District of Illinois. The federal district court later dismissed the case, and plaintiff's state law claims were remanded to the circuit court of Cook County.

¶ 5      On February 9, 2019, plaintiff filed his second amended complaint, which states in part as follows. When the complaint was filed, the Strauss family had owned the 1572 North Milwaukee Avenue building for almost 40 years. At one time, the family ownership of the building was incorporated and Brian Strauss became president of the 1572 North Milwaukee Avenue Building Corporation, which owned and operated the building. Located in the Milwaukee-North-Damen corridor, the building has four stories, consists of nearly 20,000 square feet, and has 11 apartments. Before the dispute at issue, the estimated market value of the building was $10 million. The building had long been zoned as B3-2, which allows apartments above the ground floor and street-level commercial property, such as shopping centers, large stores, and retail storefronts. At all relevant times, all other buildings along the corridor were also zoned at B3-2 or greater.

¶ 6    Alderman Moreno was a member of the city's zoning committee, which had 18 aldermen. Alderman Moreno also had a personal and financial relationship with the Double Door's owners. In 2012, Alderman Moreno told defendant that only Double Door would be allowed in the building. However, "numerous problems" arose with Double Door, including "constantly high noise levels that were problematic for residential tenants and commercial neighbors," illicit drug use and alcohol abuse by Double Door's customers, and damage done to the property by Double Door and its patrons. Double Door's lease relationship ended due to these problems and other lease violations. Plaintiff initiated a forcible entry and detainer lawsuit against Double Door in 2015.

¶ 7    On April 13, 2016, while the lawsuit against Double Door was pending, Alderman Moreno introduced a downzoning amendment to the zoning committee for just plaintiff's building. The amendment would have changed the building's zoning to B1-1, which prohibited over 30 types of businesses from occupying the building, including general restaurants, medium and large entertainment venues, and hotels or motels. Also, the apartments on the upper floors of the building would not be allowed to take new leases. On June 20, 2016, the zoning committee held the B1-1 proposal in committee, making it available to be called for a vote at any time in the future. At a meeting with Alderman Moreno on July 20, 2016, plaintiff was again told that only Double Door was allowed in the building.

¶ 8    On August 15, 2016, plaintiff won the lawsuit against Double Door, which was evicted in February 2017. Two days later, plaintiff attended a meeting at city hall with the commissioner for the Department of Planning and Development, Alderman Moreno, the chairman of the zoning committee, the zoning administrator, and the owners of the Double Door, among others. The commissioner tried to broker a sale of the building to Double Door, as well as negotiate a new month-to-month lease. Alderman Moreno also warned plaintiff that if Double Door was not

allowed back in the building, the alderman would make the zoning process very lengthy and expensive and that the building could be vacant for two to five years. Alderman Moreno asserted that he decides what kind of tenant goes into the building and all of these issues could be avoided if Double Door was allowed back into the building at a rent far less than what the market would bear. Alderman Moreno also confronted plaintiff inside the building and later on the front sidewalk on February 25, 2017. Alderman Moreno told plaintiff that he would not have a tenant for three years, there would be inspectors in the building on a daily basis, and plaintiff "can come back to [Alderman Moreno] on [plaintiff's] knees." Alderman Moreno threatened that the building would be empty with no income for plaintiff or his family.

¶ 9 The commercial space in plaintiff's building ordinarily garnered rents of $35,000 per month, "conservatively speaking." However, plaintiff's building had been vacant since Double Door was evicted in February 2017. Plaintiff received several written letters of intent to rent the space at market rates, but these potential tenants refused to sign leases unless the zoning classification remained at B3-2. Alderman Moreno's downzoning proposal loomed over the property and prevented plaintiff from leasing the commercial space to potential but reluctant tenants.

¶ 10 Plaintiff tried to sell the building. Around May 10, 2017, plaintiff entered into a written contract with an entity known as Buyer A for $9.6 million. On June 8, 2017, Buyer A cancelled the contract after learning about the pending downzoning amendment from Alderman Moreno.

¶ 11 Two days before Buyer A cancelled its contract, Alderman Moreno had proposed a second amendment that would zone the building to RS-3, which is intended to accommodate the development of single-unit detached houses on individual lots. Plaintiff's building had never been used as a single unit and shared a common wall with another building that was also a

commercial/business establishment with upper-level apartments. On June 22, 2017, the zoning committee deferred the RS-3 zoning proposal, making it available to be called for a vote at any time in the future.

¶ 12   Around July 21, 2017, plaintiff entered into a written contract to sell the building to an entity known as Buyer B for $9.1 million. Buyer B knew of the pending downzoning amendments, and the contract was contingent on the property keeping a B3-2 zoning designation. Buyer B met with Alderman Moreno and cancelled the contract on August 7, 2017, due to Alderman Moreno's downzoning scheme looming over the property.

¶ 13   Meanwhile, city officials worked with Alderman Moreno to devise a third downzoning proposal. In August 2017, Alderman Moreno proposed downzoning just plaintiff's building to B2-2, which is intended to spur development in commercial corridors with low demand for retail. B2-2 zoning prohibited over 30 categories of businesses and building uses, and allowed fewer options for the types of commercial or retail tenants that would be permitted to occupy the building. The zoning change would dramatically decrease the value of the building. Prior to a zoning committee meeting on September 11, 2017, a conversation about the B2-2 proposal was recorded between Alderman Moreno and his chief of staff. Alderman Moreno said he was going to "F*** with them, it makes their lawsuit weaker ***."

¶ 14   The complaint appended a transcript of a September 11, 2017, zoning committee hearing where the B2-2 amendment was on the agenda. There, Alderman Moreno stated in part:

>   "I humbly ask the committee for support. Planning supports and the law department both support this as a planning tool. And I know many other aldermen *** have done this in other circumstances to get the best for our community and the best for

the owner of the building. So this is not something that it's outside the purview of this committee, nor the local alderman, which is me in this case."

Defendant's zoning administrator, Patti Scudiero, stated that the matter was not recommended when it was first introduced. However, Alderman Moreno had since worked with the Department of Law and the Department of Planning and Development to amend the zoning application to a B2-2 designation, which "has a floor area ratio that is identical to the current zoning on the property of a B3-2, which is no loss of floor area." Scudiero's department supported the application.

¶ 15    The zoning committee passed the B2-2 amendment. Ten days later, Buyer B made a new offer to buy the building for $6.5 million, representing a loss of $3.1 million due to the downzoning amendment. On October 11, 2017, the Chicago City Council officially downzoned the property from B3-2 to B2-2.

¶ 16    Plaintiff further alleged that defendant's actions were motivated by Alderman Moreno's spiteful effort to get even with plaintiff and defendant assisted the alderman in his vindictive and irresponsible attack. Due to the first two downzoning amendments that were proposed and the third amendment that was approved, plaintiff was unable to lease the commercial space vacated by Double Door at the market rate for B3-2 properties. In June 2018, plaintiff sold the building for $9.1 million, losing $500,000 in purchase price alone.

¶ 17    We next summarize the causes of action alleged in the complaint that plaintiff pursues on appeal: violation of substantive due process, violation of equal protection, and inverse condemnation (all under the Illinois Constitution), and three tort claims.

¶ 18    In his substantive due process claim, plaintiff asserted in part that the B2-2 zoning ordinance was passed to satisfy the desire of one person: Alderman Moreno. No other person or

business in the community participated in or supported the proposal, and every building in the immediate area was still zoned at B3 or higher.

¶ 19      In his equal protection claim, plaintiff asserted in part that the downzoning was illegal spot zoning that was motivated by Alderman Moreno's personal agenda. No other building was downzoned. Defendant's actions were objectively unreasonable, intentional, willful and wanton, and were undertaken with malice. Alderman Moreno's intent to keep Double Door as the commercial tenant belied any theory that defendant may have acted to mitigate high noise levels or drug or alcohol abuse that accompanied Double Door's use of the property.

¶ 20      In his inverse condemnation claim, plaintiff stated in part that defendant's actions were a *de facto* taking of plaintiff's property without just compensation. Due to defendant's actions, plaintiff was not free to sell his building to buyers or lease space to new tenants at the market prices that a B3-2 zoning classification would demand. The B2-2 zoning amendment ended the freedom of choice that the Strauss family had enjoyed for over 40 years. Plaintiff suffered economic harm in the form of a decrease in the building's market value, a decrease in the purchase price of the building, and a loss of rental income.

¶ 21      Plaintiff's tort claims alleged tortious interference with contracts, tortious interference with prospective economic advantage, and intentional infliction of emotional distress. Plaintiff stated that Alderman Moreno intentionally and unjustly interfered with plaintiff's business relationships with prospective buyers and tenants. Alderman Moreno knew about the sales contracts with Buyer A and Buyer B, and his actions induced the buyers to cancel their contracts. Plaintiff also stated that Alderman Moreno's conduct was extreme and outrageous and he exerted intentional pressure to force plaintiff to let Alderman Moreno's friends back into the building.

¶ 22                      B. Defendant's Motion to Dismiss

¶ 23     Defendant filed a motion to dismiss the plaintiff's complaint under section 2-619.1 of the Code (735 ILCS 5/2-619.1 (West 2016)). Under section 2-615 of the Code (*id.* § 2-615), defendant stated in part that plaintiff did not have a constitutionally recognized property interest because the entity known as 1572 North Milwaukee Avenue Building Corporation, and not plaintiff, owned the property. Further, the facts as pled in the complaint supplied rational bases for the B2-2 zoning ordinance. Under section 2-619 of the Code, defendant contended in part that plaintiff did not have standing because a shareholder has no right to seek damages for injury to a corporation, even if he is the only shareholder. Defendant also asserted that it was immune from plaintiff's claims under the Tort Immunity Act (745 ILCS 10/1-101 *et seq.* (West 2016)).

¶ 24     In response, plaintiff asserted in part that he was suing as Brian Strauss, individually, and doing business as 1572 North Milwaukee Avenue Building Corporation and was not suing alone as a shareholder. Plaintiff also stated that "[p]laintiff consists of Brian Strauss, the individual, and Brian Strauss, the president of the corporation. The corporation speaks through Brian Strauss. The injuries that occurred to the corporation, occurred to its president as well."

¶ 25     In a written order dated August 30, 2019, the circuit court granted defendant's motion to dismiss. The court found that the substantive due process and equal protection claims failed. After noting that the parties agreed that Double Door was a well-known music venue, the court stated that plaintiff himself alleged rational bases for the zoning change, including constantly high noise levels, illicit drug use and alcohol abuse, and damage done to the property over the course of many years. Also, plaintiff did not allege that defendant as a whole—that is, the City of Chicago—had some other basis for its decision. Plaintiff only alleged that Alderman Moreno, who was not a party to the case, was motivated solely by personal animus. The court took judicial notice that at any given time, there were 50 aldermen on the city council, plus the mayor. Allegations that one of

them had an improper motive for seeking a zoning change were insufficient to sustain a claim against defendant based on that change. The court further found that the inverse condemnation claim also failed. The B1-1 and RS-3 zoning proposals were not a taking because they were never actually passed. Further, the B2-2 zoning ordinance did not deprive plaintiff of all economically beneficial use, where plaintiff admitted he later sold the building for a similar amount that he asserted it was worth before the zoning change. The court also found that defendant was immune from plaintiff's tort claims under the Tort Immunity Act. All of plaintiff's tort claims arose out of the adoption or efforts to adopt a zoning ordinance, which is a core legislative function of local governments. Alderman Moreno's alleged individual conduct—threatening to seek zoning changes out of personal animus—related squarely to his discretion to do so as an alderman. Plaintiff's second amended complaint was dismissed with prejudice.

¶ 26                                                II. ANALYSIS

¶ 27                                              A. Plaintiff's Name

¶ 28    As a preliminary matter, defendant asserts that plaintiff does not have a constitutionally protected property interest because the corporation, and not plaintiff, owned the property. Thus, any cause of action about the rights of the property belonged to the corporation itself and not its president. Defendant further states that even if plaintiff had alleged that he was the sole shareholder of the corporation, he would not have standing because an action to enforce corporate rights or redress injuries to a corporation must be brought in the corporation's name.

¶ 29    To review, plaintiff's name on the complaint is "Brian J. Strauss, individually, and d/b/a 1572 North Milwaukee Avenue Building Corporation." Plaintiff alleged in the complaint that the family ownership of the building was incorporated and Strauss eventually became president of the corporation.

¶ 30    Plaintiff appears to have taken different positions on who or what holds the protected interest at stake. In his response to defendant's motion to dismiss, plaintiff stated that plaintiff consisted of Brian Strauss, the individual, and Brian Strauss, the president of the corporation. Plaintiff also stated that the corporation spoke through Brian Strauss and that the injuries that occurred to the corporation also occurred to its president. Plaintiff asserted that he was not suing as a shareholder. Now on appeal, plaintiff contends that the complaint makes clear that 1572 North Milwaukee Avenue Building Corporation owned the property. Still, in the brief, plaintiff uses the pronoun "his" when referring to plaintiff.

¶ 31    It matters whether plaintiff is suing as a corporation or a person. The styling of plaintiff's name in the complaint and plaintiff's position on the matter in the circuit court overlooks the distinction between a corporation and its president. A corporation is separate from its shareholders, directors, and officers, who are not ordinarily liable for the corporation's obligations. *Capital One Bank, N.A. v. Czekala*, 379 Ill. App. 3d 737, 743 (2008). No person, individually—not even the president of a corporation—"does business as" a corporation. *Id.*

¶ 32    Plaintiff suggests that the issue is a mere misnomer, which is "nothing more than a party is styled in other than [its] own name." *Todd W. Musburger, Ltd. v. Meier*, 394 Ill. App. 3d 781, 806 (2009). Misnomers most frequently occur when plaintiffs misname defendants, but sometimes plaintiffs misname themselves. *U.S. Bank National Ass'n v. Luckett*, 2013 IL App (1st) 113678, ¶ 23. A misnomer may be corrected at any time (735 ILCS 5/2-401(b) (West 2016)). However, another possibility is that plaintiff made a mistake, which occurs when the wrong person (or entity in this case) was joined and served. *Protein Partners, LLP v. Lincoln Provision, Inc.*, 407 Ill. App. 3d 709, 719 (2010). An amendment to address a mistaken identity must meet certain requirements (735 ILCS 5/2-616 (West 2016)). "Courts are much more reluctant to allow parties to easily correct

parties' names if they are incorrect because of a mistaken identity than because of a misnomer." *Luckett*, 2013 IL App (1st) 113678, ¶ 21. The intent of the plaintiff is a pivotal inquiry in determining whether a case involves misnomer or mistaken identity. *Czekala*, 379 Ill. App. 3d at 743. Based on the record, we cannot determine at this time whether misnomer or mistaken identity is at work. However, we need not resolve this issue because we affirm the dismissal of plaintiff's complaint for other reasons, as discussed below.

¶ 33          B. Claims Under the Illinois Constitution Dismissed Under Section 2-615

¶ 34     We next address plaintiff's claims under the Illinois Constitution that were dismissed under section 2-615 of the Code (735 ILCS 5/2-615 (West 2016)). A section 2-615 motion to dismiss challenges the legal sufficiency of the complaint based on defects apparent on its face. *Pooh-Bah Enterprises, Inc. v. County of Cook*, 232 Ill. 2d 463, 473 (2009). The motion

> "presents the question of whether the facts alleged in the complaint, viewed in the light most favorable to the plaintiff, and taking all well-pleaded facts and all reasonable inferences that may be drawn from those facts as true, are sufficient to state a cause of action upon which relief may be granted." *Reynolds v. Jimmy John's Enterprises, LLC*, 2013 IL App (4th) 120139, ¶ 25.

The court determines whether the pleadings present the possibility of recovery. *Carter v. New Trier East High School*, 272 Ill. App. 3d 551, 555 (1995). The complaint must sufficiently set forth every essential fact to be proved. *Id.* The court only considers (1) facts apparent from the face of the pleadings, (2) matters subject to judicial notice, and (3) judicial admissions in the record. *Reynolds*, 2013 IL App (4th) 120139, ¶ 25. Exhibits attached to the complaint may also be considered. *Napleton v. Village of Hinsdale*, 229 Ill. 2d 296, 321 (2008). We review *de novo* an order granting a section 2-615 motion to dismiss. *Pooh-Bah Enterprises, Inc.*, 232 Ill. 2d at 473.

¶ 35                                    1. Substantive Due Process

¶ 36    Plaintiff contends that the complaint stated a claim that the B2-2 zoning ordinance violated substantive due process under the Illinois Constitution. Plaintiff argues that in dismissing the claim, the circuit court relied on a lone allegation about Double Door's management of its operation and ignored the allegations that defendant used its coercive power to protect Double Door. Plaintiff also asserts that the circuit court did not consider any of the factors in *Sinclair Pipe Line Co. v. Village of Richton Park*, 19 Ill. 2d 370 (1960), and *La Salle National Bank of Chicago v. County of Cook*, 12 Ill. 2d 40 (1957), which favor plaintiff.

¶ 37    Article I, section 2, of the Illinois Constitution states that "[n]o person shall be deprived of life, liberty or property without due process of law nor be denied the equal protection of the laws." Ill. Const. 1970, art. I, § 2. "The Illinois Constitution's guarantees of due process and equal protection [citation] stand separate and independent from the federal guarantees of those rights." *Hope Clinic for Women, Ltd. v. Flores*, 2013 IL 112673, ¶ 79. We may look to federal interpretations for "guidance and inspiration," but the final decision on how to construct the Illinois guarantees of due process and equal protection is for Illinois courts to draw. *Id.*

¶ 38    Substantive due process limits the state's ability to act. *In re Marriage of Miller*, 227 Ill. 2d 185, 197 (2007). "The constitutional declaration that private property shall not be taken *** without due process of law is subordinated always to the interests of the public welfare as expressed through the exercise of the police power of the State," which includes zoning laws. *Trust Co. of Chicago v. City of Chicago*, 408 Ill. 91, 97 (1951). We note that municipal ordinances are construed using the same rules that apply to statutes. *Napleton*, 229 Ill. 2d at 306. A court first identifies the nature of the right that was allegedly infringed, a necessary first step because the

nature of the right dictates the level of scrutiny that applies to determine whether a statute is constitutional. *Id.* at 307.

¶ 39    Plaintiff did not have a right to a particular zoning classification. A property owner cannot reasonably rely on the indefinite continuation of a zoning classification and acquires a property knowing that amendments can be made to a zoning ordinance within the limits of the law. *Furniture LLC v. City of Chicago*, 353 Ill. App. 3d 433, 438 (2004); see *River Park, Inc. v. City of Highland Park*, 23 F.3d 164, 166 (7th Cir. 1994) (zoning classifications are not the measure of a property interest, but are legal restrictions on the use of property). The right that was allegedly affected by the zoning ordinance is the ability to use one's property in his own way and for his own purposes. *Napleton*, 229 Ill. 2d at 308-09. An infringement of that right is subject to the rational basis test, which provides that a zoning ordinance will be upheld if it bears a rational relationship to a legitimate legislative purpose and is neither arbitrary nor unreasonable. *Id.* at 307, 309. At this point, plaintiff does not need to meet the heavy burden of proving that the zoning ordinance was unconstitutional and only needs to allege sufficient facts to proceed further. *Whipple v. Village of North Utica*, 2017 IL App (3d) 150547, ¶ 22.

¶ 40    The parties disagree about the applicability of a list of factors that courts have at times applied to determine whether an ordinance violates substantive due process. These factors are from two cases—*Sinclair Pipe Line Co.*, 19 Ill. 2d at 378, and *La Salle National Bank of Chicago*, 12 Ill. 2d at 46-47—and are as follows: (1) the existing uses and zoning of nearby property; (2) the extent to which property values are diminished by the particular zoning restrictions; (3) the extent to which the destruction of property values of the plaintiff promotes the health, safety, morals, or general welfare of the public; (4) the relative gain to the public as compared to the hardship imposed on the individual property owner; (5) the suitability of the subject property for the zoned

purposes; (6) the length of time the property has been vacant as zoned in the context of land development in the vicinity; (7) whether a comprehensive zoning plan for land use and development exists; and (8) whether the community needs the proposed use. Plaintiff contends that the factors apply and reveal the arbitrariness of defendant's decision to strip plaintiff of the uses permitted by the former B3-2 zoning. Defendant asserts that the factors are not useful in this context.

¶ 41    There has been some debate about the contexts in which the *La Salle*/*Sinclair* factors are useful, including for as-applied and facial challenges to zoning ordinances. Compare *Napleton*, 229 Ill. 2d at 319 (factors do not lend themselves to facial challenges), with *Paul v. County of Ogle*, 2018 IL App (2d) 170696, ¶¶ 28, 30 (rejecting assigning "talismanic significance" to the distinction between facial and as-applied challenges and noting that the *La Salle/Sinclair* factors can apply even where an ordinance concerns one piece of property). Still, not every case involving a challenge to a zoning ordinance on substantive due process grounds has applied the *La Salle/Sinclair* factors. See *Drury v. Village of Barrington Hills*, 2018 IL App (1st) 173042. Further, the list itself is not exclusive, and no single factor is controlling. *Whipple*, 2017 IL App (3d) 150547, ¶ 26; see *La Salle National Bank of Chicago*, 12 Ill. 2d at 46 (stating that the listed factors are "among the facts which may be taken into consideration in determining validity of an ordinance").

¶ 42    The purpose of the *La Salle/Sinclair* factors is to determine whether the zoning action was reasonably related to a legitimate government interest and was a reasonable method to achieve that purpose. *Whipple*, 2017 IL App (3d) 150547, ¶ 26. Plaintiff's complaint itself answers that inquiry. The allegations describe problems associated with the former tenant, Double Door: high noise levels that were problematic for other tenants and neighbors, illicit drug use and alcohol use by

Double Door's customers, and damage done to the property by Double Door and its patrons. A more restrictive zoning classification could be an attempt to prevent those problems from recurring. Plaintiff's complaint alleges that Alderman Moreno was the driving force behind the zoning ordinance. Yet, a zoning restriction "could be good for the public at large even if only one person asked for it." *Drury*, 2018 IL App (1st) 173042, ¶ 98. Although "our supreme court has typically invalidated" an ordinance where the record shows that the "only justification for the ordinance is that a chosen few individuals wanted it" (emphasis omitted) (*id.* ¶ 99), Alderman Moreno's agenda was not the only justification. Under the rational basis test, the court may hypothesize reasons for legislation, even if the reasoning advanced did not motivate the legislative action. *People ex rel. Lumpkin v. Cassidy*, 184 Ill. 2d 117, 124 (1998). A law will be upheld if there is "any conceivable basis for finding a rational relationship." *Id.* As stated in plaintiff's complaint, the secondary effects of having a concert venue at the building's location provided a reason to downzone the property. The complaint itself alleged a rational basis for the zoning ordinance, and so plaintiff's substantive due process claim was properly dismissed.

¶ 43                                  2. Equal Protection

¶ 44     We turn to plaintiff's equal protection claim under the Illinois Constitution. Plaintiff contends that defendant targeted a single property owner in a dense corridor of similarly situated properties with an irrational ordinance that applied only to him. Plaintiff states that his property and all the other buildings along the Milwaukee-North-Damen corridor had been zoned at B3-2 or greater, none of the other properties were downzoned, and the downzoning was out of harmony and completely inconsistent with the existing zoning and uses of other buildings in the community. Plaintiff also contends that he can state an equal protection claim without identifying similarly

situated individuals. According to plaintiff, defendant's discriminatory intent is apparent from the pattern of retaliation against plaintiff for evicting Double Door.

¶ 45    In one type of equal protection claim, a plaintiff must allege that there are other similarly situated people who are being treated differently than him and that there is no rational basis for the difference. *Whipple*, 2017 IL App (3d) 150547, ¶ 38. Where there is no fundamental right or suspect class involved, the legislature—or city council in this case—may differentiate between people who are similarly situated if there is a rational basis for doing so. *Jenkins v. Wu*, 102 Ill. 2d 468, 477 (1984). In another type of claim, an equal protection claim can be brought by a "class of one." See *Frederickson v. Landeros*, 943 F.3d 1054, 1060 (7th Cir. 2019) (citing *Village of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000)). The only form of such a claim that is clearly established within the Seventh Circuit involves governmental actors who single out a citizen for differential treatment with no objective rational basis for that difference and because of a vindictive or harassing purpose. *Id.* at 1062.

¶ 46    Regardless of its type, plaintiff's equal protection claim fails for a similar reason as the due process claim: the complaint itself provides a rational basis for downzoning plaintiff's building. Economic regulation passes the rational basis test "if there is any reasonably conceivable state of facts that could provide a rational basis for the legislation." *Vigilante v. Village of Wilmette*, 88 F. Supp. 2d 888, 890 (N.D. Ill. 2000). If the classification has some reasonable basis, it passes constitutional muster even though in practice it results in some inequality. *Id.* As noted above, plaintiff's complaint listed some of the problems that were associated with Double Door. Plaintiff asserts in his brief that the concerns about noise, drugs, alcohol, and property damage would apply equally to other establishments along the Milwaukee-North-Damen corridor, but the complaint only describes the problems that were associated with Double Door. It is conceivable that

defendant enacted the B2-2 zoning ordinance to prevent those problems from happening again in the same location. Further, that Alderman Moreno allegedly advocated for the zoning change out of revenge does not mean that the zoning committee and city council endorsed those motives. See *Civil Liberties for Urban Believers v. City of Chicago*, 342 F.3d 752, 764 (7th Cir. 2003). The defendant in this case is the City of Chicago and not Alderman Moreno. Defendant had a rational basis for only changing the zoning classification of plaintiff's building. The equal protection claim was properly dismissed.

¶ 47                                                    3. Inverse Condemnation

¶ 48    Plaintiff next contends that the complaint stated an inverse condemnation claim under the Illinois Constitution. Plaintiff argues that the government may effect a taking or damaging of property when it deprives the owner of rental income needed to sustain himself and, moreover, the taking or damaging can occur through a formal ordinance or through preliminary activities. Plaintiff also asserts that he can recover without a total deprivation, noting that the B1-1 and RS-3 proposals dramatically decreased his property value and robbed him of all commercial rental income because tenants repeatedly refused to sign leases. Plaintiff further states that Alderman Moreno destroyed purchase agreements worth $9.6 million and $9.1 million respectively. According to plaintiff, the injuries were made permanent when the B2-2 zoning ordinance was passed because the ordinance assured that plaintiff would continue to lose $35,000 every month with a vacant commercial space that was zoned out of harmony with the surrounding community. Plaintiff states that eight months after the ordinance passed, he sold the building for nearly $1 million less than its previous fair market value.

¶ 49    Article I, section 15, of the Illinois Constitution provides that "[p]rivate property shall not be taken or damaged for public use without just compensation as provided by law." Ill. Const.

1970, art. I, § 15. Inverse condemnation is a way for a property owner to recover just compensation for private property that was taken or damaged without a condemnation action having been instituted. *City of Chicago v. ProLogis*, 383 Ill. App. 3d 160, 165 (2008).

¶ 50    The Illinois Constitution's takings clause is broader than its federal counterpart because the Illinois Constitution provides a remedy for property that is damaged, in addition to property that is taken. *Hampton v. Metropolitan Water Reclamation District*, 2016 IL 119861, ¶ 31. "Damage" under the Illinois Constitution's takings clause is:

> " '[S]ome direct physical disturbance of a right, either public or private, which [the plaintiff] enjoys in connection with his property, and which gives to it an additional value, and *** by reason of [which] he has sustained a special damage with respect to his property in excess of that sustained by the public generally.' " *Equity Associates, Inc. v. Village of Northbrook*, 171 Ill. App. 3d 115, 121-22 (1988) (quoting *Rigney v. City of Chicago*, 102 Ill. 64, 81 (1881)).

If a plaintiff cannot show that the property was damaged, then the claim is analyzed under the same standard used under the federal constitution. *Hampton*, 2016 IL 119861, ¶ 16. Here, plaintiff has not explained how defendant's actions caused a physical disturbance to his property. So, we will address plaintiff's inverse condemnation claim using the same standard used in federal cases.

¶ 51    Inverse condemnation claims, such as the one here, generally involve regulatory takings. *Kaskaskia Land Co. v. Vandalia Levee & Drainage District*, 2019 IL App (5th) 180403, ¶ 22. In some instances, government regulation of private property may be so onerous so as to constitute a direct appropriation or ouster that would be compensable. *Davis v. Brown*, 221 Ill. 2d 435, 443 (2006) (citing *Lingle v. Chevron U.S.A., Inc.*, 544 U.S. 528, 537-38 (2005)).

¶ 52    We first address plaintiff's assertion that defendant's activities before the B2-2 zoning ordinance was enacted were a taking. To review, as alleged in the complaint, these activities included Alderman Moreno's proposals for B1-1 and RS-3 zoning. The B1-1 zoning amendment was introduced in April 2016 and later held in committee. The commercial space became vacant in February 2017, after Double Door was evicted. In May 2017, plaintiff entered into a contract with Buyer A to sell the building for $9.6 million. In June 2017, Alderman Moreno proposed the RS-3 zoning amendment. Two days later, Buyer A cancelled the contract after learning about the pending zoning amendment. The zoning committee later deferred the RS-3 proposal. In July 2017, plaintiff entered into a contract with Buyer B to sell the building for $9.1 million. Buyer B cancelled the contract in August 2017 due to the looming "downzoning scheme." Plaintiff also stated that he was unable to secure a tenant because tenants refused to sign a lease unless the zoning classification remained at B3-2. In August 2017, the B2-2 zoning ordinance was introduced, and the city council downzoned the property about two months later.

¶ 53    The United States Supreme Court has found that good-faith planning activities are not a taking. *Agins v. City of Tiburon*, 447 U.S. 255, 263 n.9 (1980); see *Davis*, 221 Ill. 2d at 444 (mere plotting or planning in anticipation of a public improvement is not a taking). Plaintiff asserts that defendant and Alderman Moreno's activities were done in bad faith, focusing on the B1-1 and RS-3 zoning proposals. However, plaintiff has failed to plead facts that show bad faith on behalf of the defendant in this case—the City of Chicago—in regards to the B1-1 and RS-3 zoning proposals. We decline to find that deferring the proposals, without more, constituted bad baith.

¶ 54    Further, plaintiff's back-and-forth with buyers and the fluctuations in the selling price do not indicate that a taking occurred. "Mere fluctuations in value during the process of governmental decisionmaking, absent extraordinary delay, are incidents of ownership" and do not so burden an

owner's property so as to amount to a taking. (Internal quotation marks omitted.) *Agins*, 447 U.S. at 263 n.9. Also, plaintiff asserts that Alderman Moreno and defendant targeted plaintiff over the course of two years, but the complaint indicates that their actions did not begin to affect plaintiff until the building became vacant in February 2017, after which plaintiff was unable to find a tenant to lease the space at market rates for B3-2 zoning. Plaintiff does not allege that he could not lease the space to a tenant who did not require B3-2 zoning or that he could not lease the space if he charged less than the $35,000 per month that he sought. Plaintiff alleged mere fluctuations in value that did not so burden his property as to constitute a taking.

¶ 55    In reaching this conclusion, we are not persuaded by plaintiff's reliance on *River Park, Inc. v. City of Highland Park*, 281 Ill. App. 3d 154 (1996). There, the defendant alleged that the municipality, while processing the plaintiffs' zoning petition, "decided to acquire [the] property, directed its employees to stall [the] plaintiffs' petitions, drove [the] plaintiffs into bankruptcy causing [the bank] to eventually foreclose, and then purchased the property at below-market value." *Id.* at 170. The municipality in *River Park, Inc.* carried out a scheme to actually acquire the subject property. That is a far cry from what happened here, where plaintiff maintained control over the building.

¶ 56    We next consider whether the enacted B2-2 zoning ordinance was a taking. A regulatory taking will be found when a regulation denies all economically beneficial or productive use of land. *Murr v. Wisconsin*, 582 U.S. ___, ___, 137 S. Ct. 1933, 1942 (2017). Even where a regulation does not deprive the owner of all economically beneficial use, the regulation can still be a taking based on a complex set of factors, including: (1) the economic impact of the regulation, (2) the extent to which the regulation has interfered with distinct investment-backed expectations, and (3) the character of the government action, such as whether it amounts to a physical invasion or just

affects property interests through some public program adjusting the benefits and burdens of economic life to promote the common good. *Id.* at ___, 137 S. Ct. at 1943; *Lingle*, 544 U.S. at 538-39 (citing *Penn Central Transportation Co. v. New York City*, 438 U.S. 104, 124 (1978)). In large part, the inquiry turns upon "the magnitude of a regulation's economic impact and the degree to which it interferes with legitimate property interests." *Lingle*, 544 U.S. at 540.

¶ 57    Applying the factors here, plaintiff has not alleged facts showing that the economic impact of the ordinance was sufficiently severe so as to be a taking. Plaintiff ultimately sold the building for $9.1 million. That figure is less than the $10 million that plaintiff estimated was the previous market value for the building and less than the $9.6 million that was agreed to with Buyer A. But a decrease in market value is not enough to state a claim. " 'Mere diminution in the value of property, however serious, is insufficient to demonstrate a taking.' " *Home Builders Ass'n of Greater Chicago v. City of Chicago*, 213 F. Supp. 3d 1019, 1029 (N.D. Ill. 2016) (quoting *Concrete Pipe & Products of California, Inc. v. Construction Laborers Pension Trust for Southern California*, 508 U.S. 602, 645 (1993)). Many regulations are not takings even when they prohibit the owner from making the most value-producing use of the property. *Id.* After the zoning change, plaintiff could have leased the vacant space to a tenant for whom B2-2 zoning was acceptable. See *Tim Thompson, Inc. v. Village of Hinsdale*, 247 Ill. App. 3d 863, 887 (1993) (claim properly dismissed where the plaintiff failed to allege any substantial deprivation of an economically viable use, in that the plaintiff "remained free to develop the entire parcel subject only to the newly enacted ordinance"). Moreover, as discussed above, the B2-2 zoning ordinance was an attempt to mitigate the negative effects of having a concert venue in that location. "[A]s a matter of public policy, [g]overnment hardly could go on if to some extent values incident to property could not be diminished without paying for every such change in the general law." (Internal quotation marks

omitted.) *Id.* at 889 (quoting *Lucas v. South Carolina Coastal Council*, 505 U.S. 1003, 1018 (1992)). Plaintiff's inverse condemnation claim was properly dismissed.

¶ 58                    C. Claims Dismissed Under Section 2-619—Tort Immunity

¶ 59    Next, we turn to plaintiff's tort claims, which were dismissed under section 2-619 of the Code (735 ILCS 5/2-619 (West 2016)): tortious interference with contracts, tortious interference with prospective economic advantage, and intentional infliction of emotional distress. The circuit court found that defendant was immune from these claims under sections 2-103 and 2-201 of the Tort Immunity Act (745 ILCS 10/2-103, 2-201 (West 2016)). Here, plaintiff contends that those sections do not immunize conduct that occurred before the B2-2 zoning ordinance was enacted.

¶ 60    A section 2-619 motion to dismiss disposes of issues of law and easily proved issues of fact at the outset of the litigation. *Van Meter v. Darien Park District*, 207 Ill. 2d 359, 367 (2003). Section 2-619(a)(9) of the Code permits involuntary dismissal where "the claim asserted against [the] defendant is barred by other affirmative matter avoiding the legal effect of or defeating the claim." 735 ILCS 5/2-619(a)(9) (West 2016). "Affirmative matter" includes any defense other than a negation of the essential allegations of the plaintiff's cause of action (*Kedzie & 103rd Currency Exchange, Inc. v. Hodge*, 156 Ill. 2d 112, 115 (1993)) and can include immunity under the Tort Immunity Act (*Van Meter*, 207 Ill. 2d at 367). In ruling on a section 2-619 motion to dismiss, a court must interpret all pleadings and supporting documents in the light most favorable to the nonmoving party. *Id.* at 367-68. We review a section 2-619 dismissal *de novo* (*American Service Insurance Co. v. City of Chicago*, 404 Ill. App. 3d 769, 776 (2010)) and may affirm on any basis supported by the record (*BDO Seidman, LLP v. Harris*, 379 Ill. App. 3d 918, 923 (2008)).

¶ 61    "The purpose of the Tort Immunity Act is to protect local public entities and public employees from liability arising from the operation of government." *Village of Bloomingdale v.*

*CDG Enterprises, Inc.*, 196 Ill. 2d 484, 490 (2001). Because immunity operates as an affirmative defense, the governmental entity has the burden of raising and proving its immunity under the Tort Immunity Act. *Van Meter*, 207 Ill. 2d at 370. If no immunity provision applies, then the governmental entity is liable in tort to the same extent as private parties. *Id.* at 368-69.

¶ 62    Three sections of the Tort Immunity Act are at issue: enactment immunity under section 2-103, discretionary immunity under section 2-201, and the employer liability provision under section 2-109. Section 2-103 states, "A local public entity is not liable for an injury caused by adopting or failing to adopt an enactment or by failing to enforce any law." 745 ILCS 10/2-103 (West 2016). Section 2-201 states, "Except as otherwise provided by Statute, a public employee serving in a position involving the determination of policy or the exercise of discretion is not liable for an injury resulting from his act or omission in determining policy when acting in the exercise of such discretion even though abused." *Id.* § 2-201. And, section 2-109 states, "A local public entity is not liable for an injury resulting from an act or omission of its employee where the employee is not liable." *Id.* § 2-109.

¶ 63    Plaintiff contends that section 2-103 does not immunize defendant from the allegations related to the B1-1 and RS-3 zoning proposals because section 2-103 immunity only extends to the actual adoption of an ordinance, and those two proposals were not adopted. Plaintiff further argues that section 2-201 immunity does not apply to Alderman Moreno's conduct before the B2-2 zoning ordinance was enacted. Plaintiff states that defendant made no showing that Alderman either made a policy determination or exercised discretion when he arranged private meetings to convince buyers to back out of purchase contracts and when he physically confronted plaintiff to make a series of threats. Plaintiff also contends that the B1-1 and RS-3 proposals were not policy

determinations or judgment calls and served no objective purpose other than to injure a single person.

¶ 64 Defendant met its burden to prove that the conduct that occurred before the B2-2 zoning ordinance was enacted is immunized by section 2-201 of the Tort Immunity Act. Section 2-103 would immunize defendant for the B2-2 zoning ordinance itself (*id.* § 2-103), but that ordinance is not the subject of plaintiff's argument. Plaintiff's tort claims focus on Alderman Moreno's conduct, which is immunized under section 2-201.

¶ 65 "Section 2-201 extends the most significant protection afforded to public employees under the [Tort Immunity] Act." *Van Meter*, 207 Ill. 2d at 370. To claim section 2-201 immunity, a defendant must prove that the employee held either a position involving the determination of policy or the exercise of discretion. *Monson v. City of Danville*, 2018 IL 122486, ¶ 29. The defendant must also establish that the act or omission giving rise to the injuries was both a determination of policy and an exercise of discretion. *Id.* Policy determinations are "decisions that require a governmental employee to balance competing interests and *** make a judgment call as to what solution will best serve each of those interests." (Internal quotation marks omitted.) *Brooks v. Daley*, 2015 IL App (1st) 140392, ¶ 17. Discretionary acts "involve the exercise of personal deliberation and judgment in deciding whether to perform a particular act, or how and in what manner that act should be performed." *Id.* Whether an act or omission is discretionary "escapes precise formulation and should be made on a case-by-case basis in light of the particular facts and circumstances." *Monson*, 2018 IL 122486, ¶ 29. Immunity under section 2-201 is absolute and covers both negligent and willful and wanton conduct. *Id.* There is no exception for corrupt or malicious motives. *CDG Enterprises, Inc.*, 196 Ill. 2d at 495.

¶ 66    Plaintiff does not dispute that Alderman Moreno held a position involving the determination of policy or the exercise of discretion. Our analysis thus focuses on whether Alderman Moreno's conduct leading up to the B2-2 zoning ordinance was both a determination of policy and an exercise of discretion. We must look primarily at Alderman Moreno's conduct itself, rather than the intent behind it. *Kevin's Towing, Inc. v. Thomas*, 351 Ill. App. 3d 540, 548 (2004). And, Alderman Moreno's actions were entirely consistent with the requirements for section 2-201 immunity. Alderman Moreno decided he wanted a certain tenant in a specific location in his ward, which required him to balance the interests of the community and the interests of a property owner. He further decided that mounting a pressure campaign would best serve those interests. Alderman Moreno chose particular tactics for achieving his desired goal, which included confronting plaintiff, meeting with prospective buyers, and introducing zoning proposals.

¶ 67    Plaintiff suggests that Alderman Moreno's motives and the way he acted on his policy choices preclude immunity. But that Alderman Moreno may have acted corruptly or maliciously does not change the result. See *id.* at 549 (mayor's conduct was immunized under section 2-201 even if the mayor acted out of retaliation and intent to harm). Section 2-201's plain language provides that immunity is available even if the employee abuses his discretion. 745 ILCS 10/2-201 (West 2016). That Alderman Moreno may have acted corruptly or maliciously does not preclude section 2-201 immunity here.

¶ 68    Plaintiff also contends that section 2-201 cannot apply to Alderman Moreno's actions because defendant denies that his actions reflect the zoning policy of the City. According to plaintiff, it is consistent for Alderman Moreno to be a policymaker for the purpose of tort immunity but not for other claims. In support, plaintiff cites *Valentino v. Village of South Chicago Heights*, 575 F.3d 664 (7th Cir. 2009), where an issue was whether a mayor was a policymaker for holding

a village liable under *Monell v. Department of Social Services of the City of New York*, 436 U.S. 658 (1978). The court criticized the defendants for denying that the mayor was a policymaker for *Monell* liability but arguing that he made a policy decision for the purposes of the Tort Immunity Act. *Valentino*, 575 F.3d at 679. Here, there is no such logical inconsistency. Defendant has nowhere denied that Alderman Moreno held a position involving the determination of policy. Alderman Moreno's position was not disputed in plaintiff's constitutional claims. But for both plaintiff's constitutional claims and tort immunity, Alderman Moreno's personal motives as someone who determines policy are not part of the analysis. See *Drury*, 2018 IL App (1st) 173042, ¶ 99 ("[t]he only question, at bottom, is whether the ordinance is rationally related to the public welfare, regardless of who or how many people wanted it"); *CDG Enterprises, Inc.*, 196 Ill. 2d at 495 (no exception to section 2-201 immunity for corrupt or malicious motives). Alderman Moreno's personal motives, malicious though they may have been, do not preclude immunity under section 2-201. Under section 2-109, because Alderman Moreno is not liable for injuries resulting from his conduct, defendant is also not liable. 745 ILCS 10/2-109 (West 2016).

¶ 69    We need not reach defendant's argument that tort immunity also applies to plaintiff's constitutional claims because we have affirmed the dismissal of those claims on other grounds, as discussed above. Defendant met its burden of proving that it is immune under sections 2-201 and 2-109 of the Tort Immunity Act. Plaintiff's tort claims were properly dismissed.

¶ 70                                III. CONCLUSION

¶ 71    For the foregoing reasons, the judgment of the circuit court is affirmed.

¶ 72    Affirmed.

---

**No. 1-19-1977**

---

| | |
|---|---|
| **Cite as:** | *Strauss v. City of Chicago*, 2021 IL App (1st) 191977 |

---

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Cook County, No. 18-CH-00256; the Hon. David B. Atkins, Judge, presiding. |

---

| | |
|---|---|
| **Attorneys for Appellant:** | Robert Robertson and Marko Duric, of Robertson Duric, and James Patrick McKay Jr., of Law Offices of James P. McKay Jr., both of Chicago, for appellant. |

---

| | |
|---|---|
| **Attorneys for Appellee:** | Mark A. Flessner, Corporation Counsel, of Chicago (Benna Ruth Solomon, Myriam Zreczny Kasper, and Suzanne M. Loose, Assistant Corporation Counsel, of counsel), for appellee. |

---