2024 IL App (1st) 230869-U

SECOND DIVISION
September 30, 2024

No. 1-23-0869

**NOTICE**: This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT
_____

| | | |
|---|---|---|
| JAMES J. DRURY III, as agent of the Peggy D. Drury Declaration of Trust U/A/D 02/04/00, JACK E. REICH, and JAMES T. O'DONNELL, | ) ) ) ) | |
| Plaintiffs-Appellants, | ) ) ) | Appeal from the Circuit Court of Cook County |
| v. | ) ) | |
| VILLAGE OF BARRINGTON HILLS, an Illinois Municipal Corporation, | ) ) ) | No. 15 CH 3461 |
| Defendant-Appellee | ) ) | Honorable David B. Atkins, |
| (Benjamin B. LeCompte III, Cathleen B. LeCompte, John J. Pappas, Sr., Barrington Hills Polo Club, Inc., and Victoria Kelly, | ) ) ) ) ) | Judge Presiding |
| Intervenors-Appellees.) | ) | |

_____

JUSTICE ELLIS delivered the judgment of the court.
Justices McBride and Howse concurred in the judgment.

**ORDER**

¶ 1      *Held*: Affirmed. Court applied proper standard for determining constitutionality of zoning ordinance. Court's factual findings were not against manifest weight of evidence. Court properly denied plaintiff's motion for partial summary judgment.

¶ 2      This decision is the latest in a decade-long feud between plaintiff James J. Drury (and his

co-plaintiff) and intervenor Dr. Benjamin LeCompte over LeCompte's commercial horse

boarding operation in Barrington Hills, Illinois. The complaint alleged that a Barrington Hills

zoning ordinance—Ordinance 14-19—was unconstitutional in that it was not adopted for the

public welfare but only to benefit LeCompte. LeCompte, the complaint alleged, had been

illegally boarding horses for years and used illicit campaign contributions to elect a compliant

village board to adopt an ordinance legalizing his operations and doing so retroactively, as well,

thus erasing the fines he had accrued over the years. The fact that a newly-elected village board

would repeal Ordinance 14-19 not long after its adoption, the complaint alleged, was further

evidence that it was never intended to serve the public welfare in the first place.

¶ 3    We previously held that the complaint stated a claim that Ordinance 14-19 violated

substantive due process. See *Drury v. Village of Barrington Hills*, 2018 IL App (1st) 173042

(*Drury I*). On remand, the parties conducted a 21-day trial with 21 witnesses.

¶ 4    The trial court ruled that plaintiffs had fallen far short of proving their case, that their

legal theory "collapsed entirely" at trial. The court found that Ordinance 14-19 was not so much

a battle between LeCompte alone versus the village but the product of a more heated debate

generally within the village about whether large-scale commercial horse boarding should be

permitted, with passionate advocates on each side of that debate. Thus, Ordinance 14-19 satisfied

rational-basis scrutiny—it was rationally related to the legitimate public interest of promoting

horse-boarding operations in Barrington Hills and clarifying the governing rules.

¶ 5    Plaintiffs appeal. They claim that the court's findings were incorrect, and court applied

the wrong legal standard. We emphatically disagree. In a concise but comprehensive

memorandum judgment, the court made detailed findings. Under the deferential standard of

review we employ, we could not (and would not) possibly overturn the court's findings of fact

and credibility determinations. Nor did the court fail to follow the law; the court honored the

rational-basis test for facial challenges to zoning restrictions precisely as laid out in the law and in our previous decision. We affirm.

¶ 6                                    BACKGROUND

¶ 7      Barrington Hills is a semi-rural, residential village with a long equestrian history. Since before the village's official incorporation, residents of the area have used its sprawling plots for various equestrian activities. Drury and LeCompte are neighbors who each own large tracts of land, both used for equestrian activities. This suit concerns LeCompte's decision to operate a commercial horse boarding operation, known as Oakwood Farms. Because we have laid out the background facts in several different decisions, we attempt to be brief here.

¶ 8                      I. Ordinance 06-12 and the *LeCompte* Lawsuits

¶ 9      Before 2006, the Village did not have an ordinance that directly addressed the issue of horse boarding. On June 26, 2006, the village board adopted Ordinance 06-12, which allowed horse boarding as a "home occupation." Broadly speaking, the touchstone of a "home occupation" was that the commercial aspect would not be outwardly apparent, though taking place on one's residence; the commercial use was subservient to the residential purpose of the property. Among the specifics, any commercial building could not be larger than the residential one.

¶ 10     LeCompte's operation, with its stable of nearly 30,000 square feet, capable of stalling 60 horses, would generally appear to be more than a humble "home occupation." On the other hand, the language of Ordinance 06-12 arguably permitted horse-boarding operations of *any* size, leaving LeCompte's status unclear. It is fair to say, in sum, that Ordinance 06-12 was fairly confusing and unclear with regard to the legality of commercial horse boarding.

¶ 11    When the village (largely at the prompting of plaintiff Drury) first tried to prohibit his operation in 2008 via a cease-and-desist order, LeCompte argued that his operation was an "agricultural" use, involving a different set of requirements under the zoning ordinances. The village disagreed, and LeCompte took that fight to court. A different panel of this court held that LeCompte's operation was *not* an "agricultural" use, nor was his operation otherwise permitted under the Barrington Hills zoning ordinances in any other way. See *LeCompte v. Zoning Board of Appeals for Village of Barington Hills*, 2011 IL App (1st) 100423, ¶¶ 32-33, 39. We will refer to this decision as "*LeCompte I*."

¶ 12    Meanwhile, plaintiff Drury filed a lawsuit—not this one—against LeCompte for injunctive relief as the adjacent landowner, seeking to shut down his operation. The suit was dismissed in the trial court, but this court reversed and reinstated the action. See *Drury v. LeCompte*, 2014 IL App (1st) 121894-U. We will refer to this lawsuit as "*LeCompte II*" to avoid confusion with the present lawsuit.

¶ 13    Among the contested issues in *LeCompte II* was whether, in *LeCompte I*, this court had held *only* that LeCompte's operation was not an "agricultural" use of the land, or whether this court had gone further and ruled, as well, that LeCompte's operation was not a "home occupation," either. In its decision filed in 2014, this court held that it had ruled out *both* uses as claimed bases for LeCompte's operation. See *id*. ¶ 39 ("A careful reading of the opinion establishes that this court not only rejected the Lecomptes' argument that their horse boarding operation was a permitted agricultural use, but also accepted the Village's argument that the LeComptes' use was not in compliance with the necessary code requirements concerning home occupations as a permitted accessory use.").

¶ 14    The 2014 *LeCompte II* decision, according to many observers and witnesses at trial, led

to a fair amount of confusion as to whether and to what extent large-scale commercial horse boarding was permitted in Barrington Hills at all. And that led to the consideration of a new ordinance and, ultimately, the adoption of Ordinance 14-19, the constitutionality of which is before us now.

¶ 15                                    II. Ordinance 14-19

¶ 16    Ordinance 14-19 amended the zoning laws to allow commercial horse boarding as an "agricultural" use. The ordinance also contained a retroactivity provision that made this amendment effective as of June 26, 2006—the day that Ordinance 06-12 was adopted.

¶ 17    Ordinance 14-19 was vetoed by Village President Martin McLaughlin, who believed it was "brutally apparent" that the ordinance, in particular the retroactivity provision, was designed to serve only one resident—LeCompte. But in February 2015, the village board voted 5-2 to override the veto and adopted Ordinance 14-19.

¶ 18                    III. This Lawsuit and the Repeal of Ordinance 14-19

¶ 19    Almost immediately, Drury filed the present lawsuit challenging the constitutionality of the new ordinance. He sought a declaration that Ordinance 14-19 was facially unconstitutional because it lacked a rational basis for its adoption. LeCompte and others intervened in the lawsuit.

¶ 20    But within a few months of the adoption of Ordinance 14-19 and following the April 2015 consolidated elections, the composition of the village board changed. The new board repealed Ordinance 14-19.

¶ 21    With this change in the village's legislative policy came a change in its litigation stance, too. The village now agreed with Drury that Ordinance 14-19 was unconstitutional for the short time it was in effect. The village attempted to settle this lawsuit with Drury, including in the settlement a finding that Ordinance 14-19 was facially unconstitutional and thus void *ab initio*.

¶ 22    Intervenor LeCompte objected, of course. The trial court swiftly rejected the attempted

settlement, noting that the village's changed position left LeCompte as the only party willing to

defend the constitutionality of Ordinance 14-19, and LeCompte obviously did not agree to settle.

The court likewise noted that only a court can declare an ordinance unconstitutional. We

affirmed this ruling on both grounds. See *Drury I*, 2018 IL App (1st) 173042, ¶ 64.

¶ 23    The reason this case has continued, even though Ordinance 14-19 was repealed, is that

LeCompte has taken the position that the ordinance gave him a vested right to operate his

commercial boarding facility that could not be taken away, even by a repeal. That particular

question is part of a different lawsuit not before us. But it means that the constitutionality of

Ordinance 14-19 still matters; if Ordinance 14-19 is void and of no effect, as Drury claims, then

LeCompte's vested-rights argument fails. So Drury is still capable of obtaining effectual relief in

this lawsuit, which is why we did not dismiss the *Drury I* appeal as moot. See *id*. ¶ 58.

¶ 24    In any event, the trial court dismissed the complaint for failure to state a claim. We

reversed in *Drury I*, holding that the allegations, taken as true, could support a claim that

Ordinance 14-19 was facially unconstitutional. *Id*. ¶ 118. A lengthy trial followed on remand. As

noted, the trial court found the ordinance constitutional, resulting in this appeal.

¶ 25                                    ANALYSIS

¶ 26    Because the nominal village defendant has sided with plaintiffs here, and only

Intervenors (LeCompte and others) defended Ordinance 14-19, we will discuss the arguments

and positions of "Intervenors" rather than "defendants" in our discussion.

¶ 27                                        I

¶ 28    Plaintiffs' first point of error is that the trial court failed to follow the legal test we set out

in *Drury I* for facial substantive due process challenges to a zoning ordinance. Plaintiffs are

correct that whether the court followed the proper legal standard is a legal question we review *de novo*. *People v. Campos*, 349 Ill. App. 3d 172, 176 (2004). That is as far as our agreement with plaintiffs goes.

¶ 29    The only "test" we set out in *Drury I*,  2018 IL App (1st) 173042, was the long-prevailing one for a facial substantive due process challenge to a zoning ordinance that does not involve suspect classifications like race or gender: a municipal zoning restriction " 'will be upheld if it bears a rational relationship to a legitimate legislative purpose and is neither arbitrary nor unreasonable.' " *Id*. ¶ 77 (quoting *Napleton v. Village of Hinsdale*, 229 Ill. 2d 296, 319 (2008)). We noted that earlier decisions from our supreme court (and the U.S. Supreme Court) phrased the test slightly differently, that a zoning classification must bear a " 'substantial relation to the public health, safety, morals, or general welfare.' " *Id*. ¶ 78 (quoting *Village of Euclid, Ohio v. Ambler Realty Co.*, 272 U.S. 365, 395 (1926)). But we added that our supreme court, in *Napleton*, clarified that these two formulations are merely alternate statements of the same rational-basis test. *Id*. (citing *Napleton*, 229 Ill. 2d at 315).

¶ 30    We mentioned various considerations that have entered into supreme court decisions undertaking a rational-basis analysis for a facial challenge to zoning ordinances. One is whether the ordinance benefitted only one person as opposed to the community at large (*id*. ¶ 95), though we were quick to add that "[a] zoning restriction could be good for the public at large even if only one person asked for it." *Id*. ¶ 98. Another is the timing of the ordinance, which likewise might suggest whether the ordinance was adopted to promote the public welfare or to favor a particular individual. *Id*. ¶ 96. A third is whether the village deviated in some material way from its standard practices and procedures when adopting the challenged zoning ordinance. *Id*. ¶ 100. Yet another, particularly here, was the fact that the village repealed the ordinance less than a year

after its adoption. *Id*. ¶ 110.

¶ 31    We also mentioned in a footnote that, while we principally relied on decisional law from our supreme court, these considerations in the rational-basis analysis were "consistent with" the U.S. Supreme Court decision in *Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252 (1977), an equal-protection case alleging racial discrimination in zoning. *Drury I*, 2018 IL App (1st) 173042, ¶ 111 n.2. The Supreme Court, in discussing how to divine the motives of municipal actors, mentioned such considerations as the historical background of the ordinance, departures from both procedural norms or substantive criteria in adopting it, and the sequence of events leading up to the ordinance's adoption. *Id*.; *Arlington Heights*, 429 U.S. at 267-68.

¶ 32    Plaintiffs focus in particular on our footnote citation to *Arlington Heights* and claim that the trial court did not follow the specific points identified in that decision. But we emphasized in that footnote only that our supreme court's consideration of various factors was "consistent with" *Arlington Heights* and, trying to leave no doubt on this point, added: "We base our analysis on the Illinois Supreme Court cases we have discussed, but *Arlington Heights* nevertheless supports our inquiry as well." *Drury I*, 2018 IL App (1st) 173042, ¶ 111 n.2.

¶ 33    We hope we made it clear before, and we say it here again: the question, "at bottom, is whether the ordinance is rationally related to the public welfare." *Drury I*, 2018 IL App (1st) 173042, ¶ 99. That is a more zoning-specific way of articulating the general rational-basis test and saying the very same thing: an ordinance not impacting suspect classifications like race and gender is constitutional " 'if it bears a rational relationship to a legitimate legislative purpose.' " *Id*. ¶ 77 (quoting *Napleton*, 229 Ill. 2d at 319). We never did or intend to suggest that there are hard-and-fast factors tied to this test; instead, we reviewed the case law from our supreme court

and noted various "relevant considerations" (*id.* ¶ 100) in that decisional law. That does not mean they are the only considerations, nor that those particular ones will always speak to the matter at hand.

¶ 34 So plaintiffs' notion that the trial court was required to consider only certain factors, to the exclusion of others, in some robotic point-by-point analysis, is meritless. Like any case, plaintiffs will have their theory as to why a zoning ordinance is unconstitutional, and a municipality (or here, an intervening defendant) will have its reasons why the law is rationally tied to the public welfare. The trial court will perform its traditional fact-finding function based on the evidence the parties present.

¶ 35 We will get into details of the court's findings below. Suffice it for now to state that the trial court did, in fact, consider all the factors we identified in our previous decision, if not in the mechanical fashion plaintiffs demand. We find no error in the legal standard the court applied.

¶ 36                                        II

¶ 37 That brings us to plaintiffs' challenge to the trial court's findings. We should clarify the standard of review. The constitutionality of an ordinance is ultimately a legal question subject to *de novo* review. *Wilson v. County of Cook*, 2012 IL 112026, ¶ 14. When a trial court makes findings of fact from live testimony, we ask whether the court's findings were against the manifest weight of the evidence. *People ex rel. Hartrich v. 2010 Harley-Davidson*, 2018 IL 121636, ¶ 13. That remains true in the context of factual findings as part of a constitutional challenge, as in *Hartrich*. See *id*. Plaintiffs' attempt to cast our review of the factual findings here as *de novo*, based on a 50-year-old appellate decision that never *once* mentioned the standard of review, is not serious. See *Forestview Homeowners Ass'n, Inc. v. Cook County*, 18 Ill. App. 3d 230, 232 (1974).

¶ 38    The manifest-weight standard is highly deferential to the trial court's superior view of the conduct and demeaner of the witnesses, compared to our review of a cold appellate record. *Best v. Best*, 223 Ill. 2d 342, 350 (2006). We will disturb the trial court's factual findings only if the opposite conclusion is clearly evident or the findings are not supported in the record. *Id.*

¶ 39    For this reason, we will spare the reader a blow-by-blow recount of the testimony of 21 witnesses over 21 days, a trial that filled over 4,000 pages of the appellate record. It is clear from our review that, while there was no doubt competing testimony, the evidence fully supported the trial court's conclusion; we certainly could not find the opposite conclusion clearly evident.

¶ 40    In its written findings of fact, the trial court first noted that, on its face, Ordinance 14-19 "contains numerous public welfare rules surrounding horse boarding, including procedures for manure disposal, noise/nuisance limitations, hours of operation etc., and is in all respects more detailed than" the previously applicable ordinance, Ordinance 06-12, regarding horse boarding. Indeed, Intervenors put on witness testimony, via John J. Pappas, Sr. (another intervenor) and Kurt Anderson (a zoning board member), that one of the purposes of Ordinance 14-19 was to resolve ambiguities in the previous ordinance.

¶ 41    Plaintiffs, however, claimed that any superficial general-welfare provisions were subterfuge, that the true purpose was merely to assist one man—LeCompte. The trial court aptly summarized plaintiffs' theory of the case as follows:

> "LeCompte orchestrated efforts to absolve himself and Oakwood Farms of responsibility under the 2008 cease and desist letter (which had not been issued against any other property), through illegal campaign contributions to trustees that later voted for 14-19; that he sought and obtained a letter in 2011 from the Village finding he already was in compliance; that he rushed the eventual proposal through the Village Board in meetings

with improper notice, and that he eventually accomplished his goal via 14-19, which contains a provision retroactively absolving any prior violations of 06-12 going back to its adoption."

¶ 42    The court found that plaintiffs failed to prove this theory at trial. Consider first the claim that LeCompte packed the village board with allies via "illegal campaign contributions" to get his favored ordinance passed. The court relied on multiple facts to reject this theory.

¶ 43    First, while LeCompte did offer one version of Ordinance 14-19 for the board's consideration, the board adopted a different version, drafted by a trustee (Anderson) to synthesize the various competing proposals. Second, LeCompte's donations were made for the 2011 trustee elections, yet the board did not adopt Ordinance 14-19 until 2014, after concern over the fate of large-scale horse boarding in the village spawned by the 2014 appellate *LeCompte II* decision.

¶ 44    Third, three of the trustee candidates in 2011 (Meroni, Selman, and Messer) were running on a slate called "Save Five Acres," dedicated not to horse boarding but to preserving the village's five-acre minimum for property ownership. The court found each of them credible in testifying that LeCompte's $5,000 donations had no impact on their vote, three years later, on Ordinance 14-19. Fourth, one candidate who likewise received a donation from LeCompte (Steiper) voted *against* Ordinance 14-19, while a trustee who received no donation from LeCompte (Harrington) voted for it.

¶ 45    As for the "illegality," the court found no connection whatsoever to LeCompte or anything diabolical in nature. LeCompte's donation was perfectly legitimate; the candidates on the "Save Five Acres" slate improperly signed over their contribution checks to a political action committee of the same name, a technical violation of a rule promulgated by the State Board of

Elections, which chalked up their mistake to inexperience, not willfulness.

¶ 46    To be sure, plaintiffs offered testimony that the ordinance had been adopted solely for LeCompte, principally via testimony of plaintiff Drury, board member Stieper, and former Village President McLaughlin, who vetoed Ordinance 14-19 (though the veto was overridden). McLaughlin said so explicitly at the time; Drury and Stieper opined that the village board seemed to leap into action whenever LeCompte received an adverse decision from a court or the village.

¶ 47    But the court weighed the evidence and found that "[p]laintiffs' theory that LeCompte in any way improperly influenced the passage of 14-19 was certainly not supported by the evidence at trial." The court was "particularly unpersuaded" by the statements of then-President McLaughlin, who opined when vetoing Ordinance 14-19 that certain trustees were "conflicted" because of the donations from LeCompte. The court noted that McLaughlin "offered no further evidence" for this claim, which was "more akin to argument" than a factual assertion.

¶ 48    Then there was plaintiffs' complaint of procedural irregularities in the adoption of the Ordinance 14-19, that it was "rammed" through by LeCompte's allies on the board without proper notice. The court found from the evidence that the desire for legislation was spawned not solely by LeCompte but more generally from this court's 2014 ruling in *LeCompte II*, which put into serious jeopardy the fate of horse boarding—a topic that, according to the president of the local riding club, Jason Elder, was important to "a lot of members." Indeed, four different individuals submitted zoning proposals in the wake of *LeCompte II*, including LeCompte himself, plaintiff Drury, Elder, and a gentleman named Hammond.

¶ 49    The zoning board heard all four of these proposals in a series of meetings between July and September 2014. As noted earlier, board member Anderson attempted to synthesize these

four proposals with one of his own, in part at the request of member Harrington.

¶ 50    In what the court described as "the only procedural irregularity in the passage of [Ordinance] 14-19," the village scheduled hearings on November 10 and 12 but failed to give proper notice of those hearings. The village thus cancelled them, as required by open-meeting laws, and rescheduled them for December 2 with proper notice. In the court's view, absolutely no prejudice befell plaintiffs or the general public for this error, which was swiftly corrected.

¶ 51    Indeed, at the properly scheduled December 2 hearing, the board heard such voluminous and extensive testimony (both from experts and members of the public) that the meeting had to be continued into the next day. The transcript from this hearing exceeded 300 pages. The court disagreed with plaintiffs that these "back-to-back" hearings were a second example of a procedural irregularity, likening it to a witness's testimony spilling over onto a second day of trial. The court summarized the hearings of December 2 and 3 as follows:

> "Based on the transcript of this meeting and the testimony regarding the same it was anything but a secretive, rushed attempt to sneak in an amendment, and was instead a lengthy and thoroughly public hearing featuring passionate argument on both sides of the issue by various members of the community."

¶ 52    Finally, the court considered the ordinance's retroactivity provision, which the court deemed plaintiffs' "strongest argument," in that it exonerated LeCompte for past fines incurred for violating Ordinance 06-12—and the provision was originally LeCompte's idea. Yet the court made several findings that supported its conclusion that "the Village had genuine and rational bases for adopting it."

¶ 53    Several witnesses, including board members Messer and Meroni, testified that the original Ordinance 06-12 lacked clarity on the subject of horse boarding, leaving in limbo a

number of village residents who had been boarding horses for several years, at least arguably in violation of that ordinance. The court heard evidence that as many as a dozen other large barns besides LeCompte boarded horses. Indeed, the evidence showed that another boarding operation, Deerwood Farms, had also been issued a stop-work order by the village. As Messer put it at trial, it "was important that properties that be—that have been used for boarding know that they were secure, that their historic use of the property was legal."

¶ 54    In other words, the court found that the retroactivity provision was beneficial to a number of horse boarders besides LeCompte, not to mention that having the law clearly settled was a benefit to everyone in the village. And that was one reason why board member Anderson, the drafter of the version that ultimately became Ordinance 14-19, and who initially resisted a retroactivity provision, decided that it was proper to include retroactivity. Far from a sudden about-face caused by allegiance to LeCompte, the trial court found Anderson credible in explaining that he was not influenced in the least by LeCompte and genuinely believed that other horse boarders in the village, and the public at large, would benefit from the certainty provided by a retroactivity provision.

¶ 55    Finally on this subject, plaintiffs also complain that the retroactivity provision was a *substantive* departure from the norm in that it contradicted another village ordinance, section 1-2-3, which prohibits retroactive application of any ordinance that undermines a fine or penalty pursuant to a previous ordinance. However one might harmonize these two ordinances is not a question before us; for our purposes, the only question is whether this supposed substantive departure demonstrates that the retroactivity provision was adopted solely for LeCompte or more generally for the public welfare. The evidence, as we have described, supports the trial court's conclusion that Ordinance 14-19, including its retroactivity provision, was adopted for the public

welfare and not solely for LeCompte.

¶ 56    In the end, in finding that plaintiffs failed to meet their burden, the court wholly rejected the notion that Ordinance 14-19 was adopted for LeCompte alone, as the question of commercial horse boarding "was a hotly debated and bitterly divided issue among many residents," who disagreed both on what the previous Ordinance 06-12 allowed and what, going forward, the village should allow. "That sharp divide," wrote the court, "revealed the true nature of the dispute: *rather than being LeCompte vs. the rest of the Village, it would be more accurately described as being the equestrian vs. the less-equestrian residents thereof.*" (Emphasis added.) Thus, the court ruled, the village had a rational basis for adopting Ordinance 14-19.

¶ 57    We have reviewed the entire trial record and appreciate the trial court's succinct but comprehensive review of the evidence. The court's written findings were well reasoned and thorough. And though plaintiffs certainly marshalled evidence in support of their position, we could not possibly find that the trial court's findings were unsupported by the record, or that the opposite conclusion is clearly evident.

¶ 58    As we adopt the trial court's findings of fact, we likewise agree with its legal conclusion that Ordinance 14-19 was rationally related to a legitimate public-welfare purpose of endorsing the large-scale commercial boarding of horses in Barrington Hills and in clarifying the governing rules for that activity.

¶ 59                                    III

¶ 60    The final issue is whether the court erred in denying partial summary judgment on the question of whether Ordinance 14-19's retroactivity clause, specifically, was unconstitutional. Our review is *de novo*. *Seymour v. Collins*, 2015 IL 118432, ¶ 42.

¶ 61    The entirety of plaintiffs' argument relies on a single Illinois Supreme Court case, *Commonwealth Edison Co. v. Will County Collector*, 196 Ill. 2d 27 (2001), which in turn adopted the Supreme Court's holding in *Landgraf v. USI Film Product*, 511 U.S. 244 (1994). Intervenors argue that we should ignore this claim as in violation of Rule 341(h)(7) (eff. Oct. 1, 2020), which requires that a party's argument contains citations to authority and the relevant pages of the record. Intervenors make a fair point. Plaintiffs provide not a single pin citation to *Commonwealth Edison*, never cite any other Illinois decision, and never cite to the record in this argument.

¶ 62    But we will say this much. The lesson of *Landraf* and *Commonwealth Edison* is, first and foremost, that if the legislative body has clearly indicated whether a statute is retroactive or prospective, then the court will give effect to that intent. *Commonwealth Edison*, 196 Ill. 2d at 38; *Landgraf,* 511 U.S. at 280. That, of course, is the case here with Ordinance 14-19; it explicitly has retroactive effect. Plaintiffs do not argue otherwise.

¶ 63    The only exception to this rule is if a retroactive application would violate the constitution in some way—that is, if it would retroactively punish or harm someone for conduct that was legal at the time. *Commonwealth Edison*, 196 Ill. 2d at 38; *Landgraf,* 511 U.S. at 280. The problem is that here, as the circuit court recognized in denying summary judgment, the person whose rights would be impacted by a retroactive application of Ordinance 14-19 is *LeCompte*, who would see his previous fines erased (at least arguably) by adoption of this ordinance, not to mention other horse boarders in Barrington Hills, who could gain some comfort in knowing that their past activity was now validated by the new ordinance.

¶ 64    In other words, this retroactive application *positively* impacted these individuals; it did not strip any vested rights from them or from anyone else. It did not force them to pay a fine for

something that was legal at the time. It did not outlaw *post facto* something previously allowed. It did the very opposite. It removed burdens. It legalized activity that, at least arguably, was previously illegal. The constitution protects individuals from *ex post facto* punishment; it generally prevents the government from going back in time to outlaw something previously legal; but it is not offended when the government retroactively *removes* burdens on private rights, arguably legalizing activity previously deemed illegal. *Landgraf,* 511 U.S. at 270-71, 280.

¶ 65     Plaintiff Drury may not like seeing LeCompte absolved of paying past fines (if, in fact, that was the effect of Ordinance 14-19, as appears to be the case), but he does not identify any basis in the law by which he can claim that an ordinance is unconstitutional in part because its retroactive application removed legal burdens on someone else's private rights. Indeed, he has cited no authority at all in this argument other than *Commonwealth Edison* and *Landgraf*, neither of which remotely suggest that he has a basis for lodging this constitutional challenge.

¶ 66     If plaintiffs cited some authority for the novel proposition that the constitution forbids the government from retroactively *relieving* people of legal burdens on their private rights, we would have considered it. But an appellant must do more than cite a single case, applicable only in the most generic way, and expect us to conduct the research for him and extend the law to a place that, as far as we can tell, we are not allowed to travel. See *McCann v. Dart*, 2015 IL App (1st) 141291, ¶ 18 ("The appellate court is 'not a depository in which the burden of argument and research may be dumped.") (quotation marks omitted). Plaintiffs have given us no basis to overturn the denial of partial summary judgment on this ground. We thus affirm it.

¶ 67                              CONCLUSION

¶ 68     The judgment of the circuit court is affirmed in all respects.

¶ 69     Affirmed.